GERALDINE P. CAROFANO ET AL. *v.*
CITY OF BRIDGEPORT ET AL.
(9574)

JOHN DOE ET AL. *v.* CITY OF BRIDGEPORT ET AL.
(9575)
(9578)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and F. HENNESSY, Js.

Argued April 9—decision released July 9, 1985

*J. Daniel Sagarin,* with whom, on the brief, was *William B. Barnes,* for the appellants (named plaintiffs et al.).

*Ernest C. LaFollette,* for the appellants (intervening plaintiffs in the second case, John Fiorini and Larry Morgan).

*Thomas K. Jackson,* for the appellees (defendants in each case).

SHEA, J. These consolidated appeals present as principal issues (1) the constitutionality of our "mandatory binding arbitration" statute, General Statutes § 7-473c,[1] which governs the resolution of disputes

---

[1] It is not clear from the record whether the arbitration award in this case was rendered pursuant to General Statutes § 7-473c, entitled "Mandatory binding arbitration following expiration of collective bargaining agreement or for contract reopener provisions; procedure; apportionment of costs," or General Statutes § 7-474 (h) through (j), which makes the same binding arbitration procedure available upon request of either party after rejection of the report of the factfinder. The complaints and the memoran-

between municipalities and the representatives of their employees over the terms of collective bargaining agreements when negotiations have reached an impasse, and (2) the constitutionality of a provision contained in an arbitration award issued pursuant to § 7-473c that requires current and future members of the Bridgeport police department, as a condition of such employment, to maintain a bona fide residence within the city of Bridgeport. We conclude that neither the arbitration procedure established by the statute nor the challenged award violates any provision of either the federal or the state constitutions. Accordingly, we find no error in the judgment for the defendants rendered by the trial court in these actions challenging enforcement of the residency requirement for Bridgeport police officers.

On February 20, 1933, the defendant city adopted an ordinance, § 1-13, requiring all of its officers and employees to reside in Bridgeport. This ordinance was reenacted on July 6, 1959. Until 1975, however, no action was taken to enforce the ordinance, except for the termination of one fire department employee in 1965 for violation of a departmental regulation requiring city residency. In December, 1975, the city legislative body adopted a resolution to enforce the ordinance, giving each nonresident employee until July 1, 1976, to acquire a residence in the city or be terminated from employment. Early in 1976, city

---

dum of decision refer only to § 7-473c. The stipulation of facts alludes to § 7-474 (h) as the governing statute, but does not resolve the issue. The arbitration award itself refers only to "7-473 of the General Statutes." In any event, the provisions of these statutes pertaining to arbitration of disputes between municipalities and their employees appear to be essentially similar, except that under § 7-473c binding arbitration is imposed automatically ninety days after expiration of the current collective bargaining agreement, while under § 7-474 (h) such arbitration becomes mandatory only upon a request of either party after rejection of the report of the factfinder. Although we refer only to § 7-473c in this opinion, our discussion applies with equal force to § 7-474 (h) through (j).

employees were requested to execute affidavits of residence. The defendant John Mandanici, mayor of the city, on May 17, 1976, sent letters to nonresident civil service employees advising them that, unless they complied with the residency ordinance, they would be discharged.

On February 19, 1976, seventeen members of the Bridgeport police department began an action to enjoin the city and its officials from enforcing the ordinance. A temporary injunction restraining such enforcement pending a full determination of the merits of the cause was issued on July 1, 1976, by the court, *Burns, J.,* following a hearing. When the defendants, nevertheless, initiated proceedings to dismiss the plaintiffs for failure to comply with the residency requirement, a further temporary injunction was ordered on July 20, 1976, prohibiting such proceedings.

While the temporary injunctions remained in force, the collective bargaining agreement with the policemen was being renegotiated for an additional period. The policemen's union, Local 1159 of the American Federation of State, County and Municipal Employees, AFL-CIO, and the city proceeded through the various stages of negotiation, factfinding and mediation as provided by General Statutes §§ 7-469, 7-473, and 7-473b. The city insisted upon inclusion of a residency clause in the agreement[2] and the union resisted. In order to resolve the dispute the union finally requested binding "last best offer" arbitration under § 7-473c. On June 14, 1978, the arbitrators made an award that selected for

---

[2] The brief of the intervening plaintiffs, who are also Bridgeport policemen residing outside the city, claims that "the attempt to obtain a residency clause through binding arbitration appeared to be an attempt to evade" the temporary injunction issued by the Superior Court. Although the defendants were enjoined from enforcing against the plaintiffs the residency requirement of the city ordinance "in any manner," we do not view the attempt to obtain such a residency provision as part of a collective bargaining agreement, whether by negotiation or by arbitration, as *enforcement* of the residency ordinance in violation of the injunction.

inclusion in the collective bargaining agreement the city's proposal of a residency requirement as a condition of employment, allowing 120 days for compliance from the date of implementation of the agreement.

After the award had been made, the city moved for dissolution of the temporary injunctions that had been issued in 1976 upon the ground that they interfered with implementation of the collective bargaining agreement. A suit was commenced on August 14, 1978, by eleven more members of the Bridgeport police department to enjoin enforcement of the residency clause of the agreement. This case was consolidated with the earlier action, a joint stipulation of facts was filed and the cases were tried together. The court found the issues in both cases for the defendants and rendered judgment accordingly.

In this appeal the plaintiffs claim the trial court erred in concluding: (1) that the plaintiffs, by requesting binding arbitration pursuant to § 7-473c, had waived the right to challenge the constitutionality of that statute and of the residency provision contained in the award; (2) that the municipal employment binding arbitration statute was constitutional; (3) that the residency requirement of the award as well as the residency ordinance[3] did not deprive the plaintiffs of "equal protection of the laws" under our Connecticut constitution; and (4) that the city was not estopped from enforcing the residency requirement.

---

[3] Although the trial court upheld the validity of both the residency ordinance applicable to municipal employees generally and the residency requirement contained in the arbitration award affecting only policemen, we limit our consideration of the residency issue solely to the award. It appears that all of the plaintiffs are bound by the collective bargaining agreement to which the award relates. We need not, therefore, consider the validity of the residency requirement contained in the ordinance. Since other municipal employees not affected by the award may have different interests not represented in this litigation, it would be inappropriate in this case to go beyond the narrower issue presented by the residency clause of the award affecting only policemen.

## I

We disagree with the conclusion of the trial court that, because it was the union representing the plaintiffs as members of the Bridgeport police department in the collective bargaining process that requested binding arbitration pursuant to § 7-473c after an impasse had been reached in negotiations with the city, the plaintiffs must be deemed to have waived any challenge to the constitutionality of that statute. The court relied upon the principle that "one who voluntarily proceeds under a statute and claims benefits thereby conferred will not be heard to question its constitutionality in order to avoid its burdens." 16 Am. Jur. 2d, Constitutional Law § 209. "Nor can one who avails himself of the benefits conferred by a statute deny its validity." *Buck* v. *Kuykendall*, 267 U.S. 307, 316, 45 S. Ct. 324, 69 L. Ed. 623 (1925). This court has applied this estoppel doctrine to bar a party who has sought the relief provided in an ordinance or statute from later in the same proceeding raising the issue of its constitutionality. *Florentine* v. *Darien*, 142 Conn. 415, 428, 115 A.2d 328 (1955); *Strain* v. *Zoning Board of Appeals*, 137 Conn. 36, 38, 74 A.2d 462 (1950); *Holley* v. *Sunderland*, 110 Conn. 80, 85, 147 A. 300 (1929).

The rule is plainly inapplicable to the situation presented by this case. The union's request for binding arbitration was made three weeks before such arbitration would have been automatically imposed on the parties by the terms of § 7-473c (a): "If, within ninety days after the expiration of the current collective bargaining agreement . . . neither the municipal employer or the municipal employee organization has requested the arbitration services of the state board of mediation and arbitration, said board shall notify the municipal employer and municipal employee organization . . . that binding and final arbitration is now imposed on

them . . . ." The union, therefore, did not voluntarily seek the benefit of the statute it now challenges but merely recognized that the arbitration procedure provided was mandatory and, in view of the intransigence of the parties on the residency clause issue, inevitable. Although, by making the request, the union may have advanced the arbitration process three weeks, its action cannot result in the implied waiver found by the court. The plaintiffs thus are not precluded by estoppel from challenging the constitutionality of § 7-473c or of the residency clause imposed upon them as a condition of employment by the award of the arbitrators pursuant to that statute.[4]

## II

The plaintiffs attack the constitutionality of § 7-473c upon two grounds: (1) that it violates the "home rule" provision of our state constitution, article tenth, § 1; and (2) that it constitutes an invalid delegation of legislative power. We reject both of these contentions.

## A

The first part of the home rule provision of our constitution authorizes the General Assembly by general law to delegate "such legislative authority as from time to time it deems appropriate to towns, cities and boroughs relative to the powers, organization, and form

[4] This conclusion makes it unnecessary to address other grounds for the inapplicability of the estoppel principle which the trial court applied. The complaint in Docket No. 9574 does not purport to attempt to vacate the award pursuant to General Statutes § 52-418, but to enjoin its enforcement on constitutional grounds. The plaintiffs' complaint on its face cannot be characterized as an attempt to question the validity of a statute under which a benefit has been sought "later in the same proceeding." See *Florentine* v. *Darien,* 142 Conn. 415, 428, 115 A.2d 328 (1955); *Newington* v. *Mazzoccoli,* 133 Conn. 146, 153–54, 48 A.2d 729 (1946). The complaint in Docket No. 9575 was filed long before the arbitration award and challenged the validity of the residency ordinance. "The rule would have no application to an independent proceeding challenging the constitutionality of a zoning regulation or ordinance." *Florentine* v. *Darien,* supra, 428.

of government of such political subdivisions," but reserves to that body the determination of the maximum terms of office of local elected officials. This part has been implemented by the Home Rule Act; General Statutes §§ 7-187 through 7-194; which sets forth the procedure for adopting, revising or repealing municipal charters. The second part of the constitutional provision prohibits the General Assembly, subject to specified exceptions not pertinent to this case, from enacting "special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough . . . ." "Our constitutional home rule provision . . . prohibits the legislature from encroaching on the local authority to regulate matters of purely local concern, such as the organization of local government or local budgetary policy." *Shelton* v. *Commissioner,* 193 Conn. 506, 521, 479 A.2d 208 (1984); *Caulfield* v. *Noble,* 178 Conn. 81, 90–91, 420 A.2d 1160 (1979).

In *Caulfield* v. *Noble,* supra, we held that a state statute of general application requiring the use of surplus funds by a town at the end of its fiscal year to reduce the taxation rate for the following year could not, by virtue of the autonomy given to towns in the matter of real property taxation, override a home rule charter provision allowing the surplus to be retained in a special unallocated account. From this precedent the plaintiffs argue that setting conditions of employment for municipal employees is also a matter of purely local concern that can be delegated only to the municipality under the home rule constitutional provision and not to "politically unaccountable private arbitrators." Unlike *Caulfield,* however, the plaintiffs point to no specific provision of the Bridgeport charter that conflicts directly with either the arbitration procedure followed or the outcome thereof in the form of a residency clause. Presumably they rely upon the general authority

of the governing officials of the town to establish the conditions of employment as well as the great impact this determination has upon such governmental functions as municipal taxation and budget making. Thus it is claimed that the compulsory arbitration statute, § 7-473c, deprives local officials of the responsibility concerning such matters vested in them by the charter as well as the electorate.

It is clear that § 7-473c, being a statute applicable to every municipality in this state, does not violate the prohibition against "special legislation relative to the powers of any single town. . . . " The remaining consideration is whether its purpose or its operation involves subjects of purely local concern, as in *Caulfield*. The evident purpose of the compulsory arbitration feature of § 7-473c is to avoid strikes and their attendant disruptions of municipal services by providing a mechanism to resolve by arbitration those issues concerning which the parties to an expiring municipal collective bargaining agreement have been unable to reach agreement by negotiations. Such possible disruptions, at least where such vital services as those performed by policemen are involved, are matters of statewide concern not only because their impact is seldom confined exclusively to the residents of one municipality, but also because the state as parens patriae has the ultimate responsibility for protecting the safety of the inhabitants of even a single community whose own resources are inadequate for the task. Accord General Statutes §§ 29-5, 29-7. The avoidance of strikes by municipal employees that might occasion state intervention to protect the inhabitants of a community is unquestionably a matter of statewide concern and § 7-473c, therefore, does not violate the home rule provision of our state constitution.

## B

The plaintiffs also attack § 7-473c as an unconstitutional delegation of legislative power because: (1) the arbitrators are not public officials accountable to the electorate; (2) the statute contains standards insufficient to guide the arbitrators in making their award; and (3) it fails to provide an adequate procedure for judicial review. None of these claims is persuasive.

Section 7-473c (a) contains no restrictions or qualifications for the three arbitrators who form the panel to decide the issues in a dispute over a new collective bargaining agreement for municipal employees. The statute allows the "chief executive officer of the municipal employer" to name one member, the "executive head of the municipal employee organization" to choose a second, and the two arbitrators thus designated to select the third, who acts as chairman. The plaintiff claims that this statutory delegation of legislative power to persons having, by virtue of their selection as arbitrators, only a tenuous connection with government that is limited to the duration of the performance of their duties in the dispute referred to them violates a basic principle that determinations having the force of law should be made only by those who are in some manner accountable to the electorate. It has been contended that "this approach to legislative decision-making, precisely because it is designed to insulate and, in fact, does insulate the decision-making process and the results from accountability within the political process, is not consonant with proper governance and is not an appropriate method for resolving legislative-political issues in a representative democracy." *Dearborn Fire Fighters Union* v. *Dearborn,* 394 Mich. 229, 258, 231 N.W.2d 226 (1975) (opinion of Levin, J.). The majority of courts, nevertheless, have sustained statutes imposing compulsory arbitration to resolve dis-

putes that arise during collective bargaining between municipal employers and employees. *Arlington* v. *Board of Conciliation & Arbitration,* 370 Mass. 769, 352 N.E.2d 914 (1976); *Warwick* v. *Warwick Regular Firemen's Assn.,* 106 R.I. 109, 256 A.2d 206 (1969).

In this state the delegation of the governmental power of eminent domain to private persons rather than to public officials has frequently been approved where a public purpose is thereby advanced and where the benefit of the property taken is considered to be available to the general public. *Connecticut College* v. *Calvert,* 87 Conn. 421, 427–28, 88 A. 633 (1913); cf. *New York, N.H. & H. R. Co.* v. *Long,* 69 Conn. 424, 435, 37 A. 1070 (1897); *Evergreen Cemetery Assn.* v. *Beecher,* 53 Conn. 551, 5 A. 353 (1886); *Todd* v. *Austin,* 34 Conn. 78, 89–91 (1867). "The legislature itself may exercise the power or may delegate that right to another." *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 587, 87 A.2d 139 (1952). We have also upheld the statutory designation of a private credit corporation as the sole agency to investigate applications for mortgages to be insured through the credit of the state, the ultimate authority to grant such applications being retained by a state agency. *Roan* v. *Connecticut Industrial Building Commission,* 150 Conn. 333, 342–43, 189 A.2d 399 (1963). We perceive no inherent vice that should preclude enlistment by the legislature of private individuals or agencies to achieve a public purpose by the exercise of a governmental power so long as adequate safeguards are provided. Although elected officials and those appointed by them as public officers may be more directly answerable to the electorate for their doings, the principle of accountability remains viable in the ability of legislators to terminate or modify any delegation of legislative power

that has been made and in the ultimate authority of the people to change the law by electing those amenable to the public will.

The claim that the standards prescribed by § 7-473c for guidance of the arbitrators are constitutionally infirm rests upon the principle that, "[i]f the Legislature fails to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad, its attempt to delegate is a nullity." *State* v. *Stoddard,* 126 Conn. 623, 628, 13 A.2d 586 (1940); see *A.L.A. Schechter Poultry Corporation* v. *United States,* 295 U.S. 495, 530, 55 S. Ct. 837, 79 L. Ed. 1570 (1935). The only provision of the statute explicitly setting forth any guidelines is as follows: "The factors, among others, to be given weight by the arbitration panel in arriving at a decision shall include the wages, salaries, fringe benefits and working conditions prevailing in the labor market, the ability of the municipal employer to pay and the interests and welfare of the employees." General Statutes § 7-473c (c) (2). The plaintiffs criticize this delineation of the criteria to be followed as unduly vague and also point to the absence of any declaration of legislative purpose in the statute.

Where an act does not contain an express statement of its public purpose, we may consider the entire act as well as its legislative history to ascertain such a purpose. *Roan* v. *Connecticut Industrial Building Commission,* supra, 339. It is evident from the debate that attended the adoption in 1975 of § 7-473c with its mandatory arbitration feature that the principal concern of the legislators was to devise a method for resolving impasses in contract negotiations between municipal employers and their employees that might otherwise result in strikes or other disruptions of essential public services.[5] Though such strikes were illegal; General

---

[5] 18 S. Proc., Pt. 7, 1975 Sess., pp. 3506–59.

Statutes § 7-475; the legislature was concerned that "in many cases the employee organizations have, as a result of the frustrations in negotiations, have [sic] taken some type of job action." 18 H. R. Proc., Pt. 11, 1975 Sess., p. 5324, remarks of Representative Dominic J. Badolato. It was believed that binding arbitration upon issues that could not be resolved by the elaborate system of negotiations provided in related statutes would be the most fair and effective device for resolving these disputes. The structure of § 7-473c, which limits the arbitrators to choosing the "last best offer" of one party over that of the other, indicates that the primary emphasis of the legislation was to induce settlement of disputes by negotiation under the impetus that the most reasonable proposal would probably gain acceptance by the arbitrators. This narrowing of the scope of arbitrator discretion to a choice between two proposals as formulated by the parties upon an unresolved issue significantly circumscribes what might otherwise be deemed a broad delegation of legislative power. The specification of certain factors to be considered by the arbitrators in making this limited choice is a further control over their exercise of the delegated authority.

"As the complexity of economic and governmental conditions has increased over the years, courts have tended to approve ever broader standards to facilitate the operational functions of administrative agencies." *Wilson* v. *Connecticut Product Development Corporation,* 167 Conn. 111, 120, 355 A.2d 72 (1974). Given the impracticability of prescribing standards that will precisely govern the outcome of every issue that may arise in contract negotiations between municipal employers and employees, we conclude that those set forth in § 7-473c are sufficient to satisfy constitutional requirements for a valid delegation of legislative power.

The plaintiffs' remaining objection to the validity of the statute is that there is no provision for an appeal to the courts in the manner ordinarily available for review of decisions of administrative agencies. See, e.g., General Statutes §§ 8-8, 8-30. Such review, of course, is ordinarily limited to the record before the agency and to ascertaining whether some material error of law has occurred or administrative discretion has been clearly abused. See *Burnham* v. *Planning & Zoning Commission,* 189 Conn. 261, 265–66, 455 A.2d 339 (1983); *Raybestos-Manhattan, Inc.* v. *Planning & Zoning Commission,* 186 Conn. 466, 469–70, 442 A.2d 65 (1982); cf. General Statutes § 4-183 (g). Unlike decisions of state agencies that may be appealed under the Uniform Administrative Procedure Act; General Statutes §§ 4-166 through 4-189; a decision of the arbitrators pursuant to § 7-473c may be judicially reviewed only in accordance with General Statutes §§ 52-418 and 52-419 upon a motion to vacate or modify the award, the same procedure that is available in consensual arbitration. The grounds for vacating an award are restricted to: (1) procurement of the award by "corruption, fraud or undue means"; (2) "evident partiality or corruption" of an arbitrator; (3) misconduct in refusing to postpone the hearing for sufficient cause; or (4) instances where "the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." General Statutes § 52-418. Awards may be modified only in the event of: (1) a "material miscalculation of figures" or "material mistake in the description" of any person, thing or property referred to in the award; (2) an award upon a matter not submitted to the arbitrators unless it does not affect the merits of the decision upon the matters submitted; or (3) imperfections in matters of form not affecting the merits of the controversy. General Statutes § 52-419.

We are not convinced that the scope of review provided for decisions rendered under § 7-473c is so essentially different in practical application from that available for reviewing determinations of administrative agencies that any constitutional deficiency is perceptible. As we have noted, the authority of the arbitrators is limited to the two choices presented to them by the parties in the form of "last best offers." Any deviation from this restriction would indicate that the arbitrators had "exceeded their powers," a basis for vacating the award under § 52-418. An award made without giving weight to the factors specified for consideration by the panel in making a decision would be similarly infirm.

The circumstances of this case do not require that we explore fully the extent of judicial review available for decisions resulting from compulsory arbitration under § 7-473c or decide to what extent it is limited to the scope permitted where the parties have voluntarily submitted an issue to the arbitrators. See *Bruno* v. *Department of Consumer Protection,* 190 Conn. 14, 18–19, 458 A.2d 685 (1983); *Carroll* v. *Aetna Casualty & Surety Co.,* 189 Conn. 16, 22–23, 453 A.2d 1158 (1983). In part III of this opinion we do undertake to review the constitutional validity of the residency clause that the arbitrators have chosen to impose as a condition of employment.[6] Unlike consensual arbitration, where the terms of the submission commonly make the decision of the arbitrators final upon all questions of law as well as fact, in compulsory arbitration the par-

---

[6] As noted previously in footnote 4, supra, neither action before us is an attempt to vacate the award of the arbitrators pursuant to § 52-418. The defendants do not contest the propriety of these independent actions, one of which seeks to enjoin enforcement of the residency clause in the award and the other enforcement of the residency ordinance. Obviously, if review of the constitutional issues raised by the residency requirement is permissible in these independent actions, it would make little sense to preclude it in an action to vacate the award pursuant to § 52-418.

ties cannot be deemed to have waived their right to challenge any constitutional infringement that the award may entail. We conclude, therefore, that there is a provision for judicial review of arbitrator determinations under § 4-473c adequate to satisfy constitutional requirements.

## III

The residency requirement at issue in this case, which is not a prerequisite to municipal employment initially, must be distinguished from the *durational* residency requirement that was found to impinge upon the fundamental right of travel and thus to violate the equal protection clause of the federal constitution in *Bruno* v. *Civil Service Commission,* 192 Conn. 335, 351, 472 A.2d 328 (1984). "Bona fide residency requirements as continuing conditions of municipal employment rest upon footings significantly different from those of durational residency requirements." *Andre* v. *Board of Trustees,* 561 F.2d 48, 52 (7th Cir. 1977). In the *Bruno* opinion this court differentiated between "a *bona fide* residency requirement" and "a durational one," declaring that "[i]f it is important to develop relations between city employees and citizens, then the employee may be required to live within the geographical confines of the city while that employee holds municipal employment." Id., 351. This dictum in *Bruno* is not a controlling precedent, however, not only because the circumstances there did not actually present the issue now before us, but also because the opinion is limited to a consideration of only federal constitutional provisions.

The plaintiffs base their attack on the constitutionality of the residency requirement now before us wholly upon article first, §§ 1 and 20, of our state constitution, which generally have been construed to afford the same right to "equal protection of the laws" as is pro-

vided by the fourteenth amendment to our federal constitution. *Lockwood* v. *Killian,* 172 Conn. 496, 500, 375 A.2d 998 (1977); *Karp* v. *Zoning Board,* 156 Conn. 287, 295, 240 A.2d 845 (1968); *St. John's Roman Catholic Church Corporation* v. *Darien,* 149 Conn. 712, 184 A.2d 42 (1962); *Barnes* v. *New Haven,* 140 Conn. 8, 14, 98 A.2d 523 (1953). Apparently they recognize that the federal courts, as final arbiters of the United States constitution, have rejected the claim that a bona fide residence requirement as a condition for continued employment of such municipal employees as policemen impairs federal constitutional rights. *McCarthy* v. *Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S. Ct. 1154, 47 L. Ed. 2d 366 (1976) (fireman); *Detroit Police Officers Assn.* v. *Detroit,* 385 Mich. 519, 190 N.W.2d 97 (1971), appeal dismissed, 405 U.S. 950, 92 S. Ct. 1173, 31 L. Ed. 2d 227 (1972) (policemen); *Andre* v. *Board of Trustees,* supra (policemen, firemen and other municipal employees).

The plaintiffs argue that the right of travel, intrastate as well as interstate, is a fundamental right that includes the right to live where one chooses without restriction and that any impingement upon this right of municipal employees as a class by restricting the location of their residences can be justified only where some compelling state interest is advanced. Thus they claim the benefit of the most exacting standard for review of classifications alleged to violate the constitutional right of equal protection of the laws. They rely upon decisions of New Hampshire courts that have construed state constitutional provisions affording the right of equal protection to invalidate residency requirements, like that involved here, applicable to municipal employees generally. *Angwin* v. *Manchester,* 118 N.H. 336, 386 A.2d 1272 (1978); *Donnelly* v. *Manchester,* 111 N.H. 50, 274 A.2d 789 (1971). Most courts, however, have found no infringement of the fundamental right to

travel in a requirement of residency within a reasonable time after employment by a municipality and have upheld such a requirement under the "rational basis" test as a permissible exercise of the legislative power of a municipality. *Ector* v. *Torrance,* 10 Cal. 3d 129, 514 P.2d 433, 109 Cal. Rptr. 849 (1973), cert. denied, 415 U.S. 935, 94 S. Ct. 1451, 39 L. Ed. 2d 493 (1974); *Lines* v. *Topeka,* 223 Kan. 772, 777–79, 577 P.2d 42 (1978); *Abrahams* v. *Civil Service Commission,* 65 N.J. 61, 66–73, 319 A.2d 483 (1974); *Kennedy* v. *Newark,* 29 N.J. 178, 183, 148 A.2d 473 (1959). Some courts have found a continuing residency requirement to impact upon a fundamental right to travel, but, nevertheless, have concluded that a municipality does have a compelling state interest sufficient to uphold the requirement when applied to policemen. *Krzewinski* v. *Kugler,* 338 F. Sup. 492, 497–98 (D.N.J. 1972); *Fraternal Order of Police* v. *Hunter,* 49 Ohio App. 2d 185, 199–200, 360 N.E.2d 708 (1975).

It must be conceded that "[e]ven a bona fide residence requirement would burden the right to travel, if travel meant merely movement." *Memorial Hospital* v. *Maricopa County,* 415 U.S. 250, 94 S. Ct. 1076, 39 L. Ed. 2d 306 (1974). The right to travel that has been found to be "fundamental," and thus to necessitate demonstration of a compelling state interest for maintenance of any governmental restraint thereon, involves much more than locomotion. Id., 254. It concerns the right "to migrate, resettle, find a new job, and start a new life." *Shapiro* v. *Thompson,* 394 U.S. 618, 629, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969). It is the barriers to such resettlement raised by durational residency requirements as qualifications for receiving benefits or exercising privileges that have been found to have such serious impact as to infringe upon the constitutional right to travel. *Memorial Hospital* v. *Maricopa County,* supra, 254–55; *Dunn* v. *Blumstein,*

405 U.S. 330, 340–42, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972). "Durational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right." *Dunn* v. *Blumstein,* supra, 342. No such vice has been found with respect to "appropriately defined and uniformly applied bona fide residence requirements." Id., 342 n.13.

We see no reason to give the equal protection clauses of our state constitution in this instance a more expansive reading than has been accorded to the corresponding provisions of our federal constitution. Nothing in their language or history supports the plaintiffs' contention that a person has a fundamental right to employment by a municipality without regard to the location of his residence. See *McCarthy* v. *Philadelphia Civil Service Commission,* supra, 646. Accordingly, since no fundamental constitutional right is implicated by the residency requirement, it is not essential for the city to demonstrate a "compelling" interest to sustain its validity.

The plaintiffs, as a fall-back position, urge that, if the right of a municipal employee is not deemed to be "fundamental" and thus to invoke the "strict scrutiny" standard of review applicable to rights so characterized, it is of sufficient importance to call for an intermediate standard and not merely the minimal "rational basis" test. Courts have tended to depart from the minimal standard where the interests affected by the governmental restriction are sufficiently elevated in the hierarchy of social values and to devise various formulae less rigid than the compelling state interest criterion that essentially necessitate balancing private against governmental concerns with varying degrees of deference to legislative judgment. Tribe, American Constitutional Law § 16-30; see *Plyler* v. *Doe,* 457 U.S. 202, 216–26, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982). This

court has recently applied such an intermediate standard to the right of children to a public education. *Horton* v. *Meskill,* 195 Conn. 24, 37, 486 A.2d 1099 (1985); cf. *Keogh* v. *Bridgeport,* 187 Conn. 53, 66–67, 444 A.2d 225 (1982); *Eielson* v. *Parker,* 179 Conn. 552, 564, 427 A.2d 814 (1980). Such a standard has been applied in considering restrictions on employment eligibility, the availability of subsistence benefits, the retention of a driver's license, and the opportunity for higher education. *Hampton* v. *Mow Sun Wong,* 426 U.S. 88, 102–103, 96 S. Ct. 1895, 48 L. Ed. 2d 495 (1976); *United States Department of Agriculture* v. *Murry,* 413 U.S. 508, 519, 93 S. Ct. 2832, 37 L. Ed. 2d 767 (1973) (Marshall, J., concurring); *Vlandis* v. *Kline,* 412 U.S. 441, 459, 93 S. Ct. 2230, 37 L. Ed. 2d 63 (1973) (White, J., concurring); *Bell* v. *Burson,* 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971).

Situations triggering such intermediate review, other than sensitive classifications relating to stereotypes or disadvantaged minorities, have usually involved a significant interference with liberty or the denial of benefits considered to be vital to the individual. Tribe, American Constitutional Law § 16-31. Even if we were to deem such an intermediate standard appropriate in reviewing this claimed infringement on the liberty of a person to live where he chooses while maintaining employment with a municipality, we would also conclude that, at least with respect to policemen such as the plaintiffs, the interests of the municipality in imposing residency as a condition of employment far outweigh the liberty interest asserted. For municipal employees in general, a residence requirement has been found to promote such governmental interests as "ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee per-

formance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism . . . ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries." *Ector* v. *Torrance*, supra, 135. Some of these considerations have special significance with respect to policemen as guardians of the public safety. "A policeman's very presence, whether actually performing a specified duty during assigned hours, or engaged in any other activity during off-duty hours, provides a trained person immediately available for enforcement purposes." *Fraternal Order of Police* v. *Hunter*, supra, 199. "Wherever possible, police officers should be encouraged to live within city limits for it is important that officers have a feeling of commitment to the city, above and beyond the obligation to police it." The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report, The Police (1967). "[A] policy of requiring fire department and police force residency would tend to increase the presently low degree of community cooperation uniformly observed by law enforcement officials." *Krzewinski* v. *Kugler*, supra, 499. We conclude that Bridgeport's determination that persons who wish to serve as its policemen must also reside within its boundaries is a reasonable exercise of its discretion to run its own affairs closely tailored to the governmental concerns advanced and is not overridden by the interest in obtaining or continuing such employment of a person who prefers to live elsewhere. Thus we find that the residency requirement survives scrutiny even if an intermediate standard of review is applied under the circumstances of this case. It follows a fortiori that the requirement in this instance also satisfies the less demanding "rational basis" standard applicable as a minimal requirement for governmental classifications.

## IV

Finally, the plaintiffs claim that the city is estopped from now imposing by means of a collective bargaining agreement a residency requirement upon policemen, when for more than forty years it has failed to enforce a similar requirement of a city ordinance applicable to all municipal employees. The stipulation of facts presented to the trial court indicates that each of the plaintiffs was first employed as a policeman while a resident of Bridgeport at some time after the adoption of the municipal employee residency ordinance in 1933. While so employed each of them later established a home outside the city, despite knowledge of the residency ordinance. These individuals were aware that many other policemen, including superior officers, did not reside in Bridgeport. They continued to maintain with the police department Bridgeport addresses and telephone numbers, usually those of relatives through whom they could be contacted. Each also informed some of his superior officers of his out-of-town residence and telephone number. The amount of time spent at his Bridgeport address by each plaintiff varies from several nights per week to virtually none. Some of the plaintiffs vote as residents of Bridgeport in accordance with their addresses as maintained with the police department; some pay taxes to Bridgeport on motor vehicles registered to them at those addresses. The extent to which the plaintiffs have reasonably relied upon the inaction of the city in enforcing the residency ordinance against them and other municipal employees is disputed.

The memorandum of decision does not address the merits of the estoppel claim of the plaintiffs, apparently because the trial court felt the issue had been foreclosed by the arbitration award, in which it found the plaintiffs to have participated voluntarily. Although we have

concluded that the plaintiffs had no choice but to recognize the inevitability of arbitration as mandated by § 7-473c, the stipulated facts which are the basis for the estoppel claim do not compel a conclusion that the arbitrators exceeded their powers in accepting the city's proposal for enforcement of a residency requirement by including it in the collective bargaining agreement. See General Statutes § 52-418. The plaintiffs through their bargaining representative might well have proposed individualized consideration of the varying circumstances of each policeman with respect to the extent of his reliance upon nonenforcement of the residency ordinance and the hardship that compliance would entail. They preferred for all members of the bargaining unit to have the issue of residency hinge upon the outcome of the pending cases concerning the validity of the residency ordinance. The arbitrators acted within their discretion when they selected the city's proposal for residency as a condition of employment with an allowance of 120 days for compliance. They followed the mandate of § 7-473c requiring acceptance of "the final provision relating to such unresolved issue as contained in the statement of last best offer of one party or the other."

If the city had never enacted a residency ordinance it would not have been precluded from seeking through the collective bargaining process the inclusion of a residency requirement for policemen as a condition of employment. Any claim of estoppel because of the absence of such a requirement during the prior employment of policemen who resided outside the city would be without merit. No more valid bar to action deemed to be in the best interests of the city is raised by the fact that for forty years an ordinance has remained in existence that the plaintiffs by various subterfuges have evaded, even though superior officers may have been aware of their duplicity.

We have recognized that there are situations in which the doctrine of equitable estoppel may be applicable to municipalities. *West Hartford* v. *Rechel,* 190 Conn. 114, 121, 459 A.2d 1015 (1983); *Zoning Commission* v. *Lescynski,* 188 Conn. 724, 731, 453 A.2d 1144 (1982); *Dupuis* v. *Submarine Base Credit Union, Inc.,* 170 Conn. 344, 354, 365 A.2d 1093 (1976). "The courts have consistently held that the general rule applicable to the invocation of the doctrine of estoppel against municipal corporations should be limited and invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably *induced* by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the . . . regulations." (Emphasis in original.) *Dupuis* v. *Submarine Base Credit Union, Inc.,* supra, 354. There is nothing in the record to suggest that the enforcement of a residency requirement through a collective bargaining agreement will be any more "oppressive" in Bridgeport, where the existing residency ordinance had become virtually a "dead letter," than in some other municipality attempting to impose a similar requirement for the first time. A municipality cannot be estopped from changing its existing laws or policies in the light of new developments. There can be no reasonable reliance upon an assumption that the legal status quo will never be altered.

Although we have concluded that the city was not precluded from seeking a residency requirement for policemen through collective bargaining and that the arbitrators did not exceed their powers by choosing that proposal over the one advanced by the plaintiffs' representative, we do not purport to resolve in this opinion all of the issues which may arise in the implementation of that provision of the collective bargaining agreement. Some courts have found an impair-

ment of the obligation of contract violating the federal constitution in the retroactive application of a residency requirement. *Fraternal Order of Police* v. *Hunter,* supra, 191–93; see *Lines* v. *Topeka,* supra, 780–81; *Cross* v. *Whedon,* 93 Mich. App. 13, 19, 285 N.W.2d 780 (1979). The record before us does not adequately show whether any of the plaintiffs have acquired vested contractual rights that will be affected by application of the residency requirement to them. Nor is it clear that the city will not extend the time for compliance or even grant waivers thereof in individual cases of extreme hardship or where valid claims for breach of contract may result in substantial awards of damages. We shall cross these bridges when we come to them. For now we decide only that the inclusion in the collective bargaining agreement of a residency requirement as a condition for continued employment as a police officer is not precluded by any of the circumstances presented to the trial court in the stipulation of the parties.[7]

There is no error.

In this opinion the other judges concurred.