[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Crossroads is a limited partnership which owns a tract of real property consisting of approximately 64 acres located in the Town of Cheshire at the intersection of Interstate 691, Connecticut Route 10 and East Johnson Avenue. (Plaintiff's Exh. A, Certified Deeds; Plaintiff's Exh. B, property Map of Town of Cheshire, Record, Item 19, Transcript of July 19, 1989 Public Hearing, p. 5.) Joel Banker, one of the partners, appeared at the public hearing on the proposed amendment and referred to the partnership as Banker and Banker. (Record, Item 19, p. 18.)
The Crossroads property is located in the IC Zone. (Plaintiff's Exh. B; Plaintiff's Exh. C, Location Plan; Record, Item 26, Zoning Map.) The IC Zone was created when the PZC CT Page 2953 adopted "Section 48 Interchange Zone Regulation" on May 23, 1985, effective May 25, 1985. The purpose of section 48 "is to encourage the effective and timely development of land for high quality office and commercial development surrounding the I-691/Route 10 Interchange." (Record, Item 25, 48.1.)
The IC Zone is divided into four quadrants by the I-691/Route 10 Interchange. (Record, Item 26; Plaintiff's Exh. B.) Crossroads' property is located in the southeast quadrant. (Plaintiff's Exh. B.) Two private entities controlled by John Errichetti Associates ["Errichetti Associates"] are the owners of northwest and southwest quadrants. (Record, Item 33, Letter of Decision Re: Special Permit Application for John A. Errichetti; Plaintiff's Exh. B.) Property of the Connecticut Department of Transportation [the "DOT"] is situated in the northeast quadrant. (Plaintiff's Exh. B.)
Crossroads has already received approval for an office building on its property. (Defendant's Exh. 2, Minutes, March 27, 1989; Record, Item 19, p. 17.) But while several companies have approached the Town's planning office regarding development of office space in the IC Zone, Mr. Banker testified that "[n]one of those people have come to us with a proposal." He stated, "We are constantly and seriously seeking qualified uses for the property and in today's market, office is just not a remotely possible use." (Record, Item 19, p. 18; Item 29, List of Companies Which Approached Planning Office; see also Defendant's Exh. 2.)
On November 25, 1985, six months after the IC Zone Regulations became effective, Errichetti Associates was granted a special permit to construct a 925,000 square foot shopping center in the IC Zone to be known as the Apple Valley Mall ["AVM"]. (Record, Item 33.) Errichetti Associates' proposal consists of an enclosed shopping mall to be located on the Cheshire-Southington line, with over 590,000 square feet of floor area in Cheshire. (Amended Complaint, March 12, 1990, par. 6; Answer April 18, 1990, par. 5; Record, Item 19, p. 6.) Although Errichetti Associates' approval contemplated the commencement of construction within two years, construction was not initiated within that period, and the Commission voted to extend the permit three times. (Amended Complaint, par. 8; Answer, par. 1; Record, Item 19, p. 6.) At the public hearing, counsel for Crossroads stated that Errichetti Associates' was extended to November 25, 1989. (Record, Item 19, p. 6.)
At the Commission's March 27, 1989 meeting, representatives of Crossroads and Newmarket Development Company ["Newmarket"] met with the commission and discussed a proposal for the development of a regional shopping center of between 350,000 to 370,000 square feet on the Crossroads property. (Amended Complaint, par. 10; CT Page 2954 Answer, par. 6; Defendant's Exh. 2; see Record, Item 1n, Memorandum and attachments to Commission from Economic Development Coordinator, p. 2, Minutes dated March 23, 1989.) At that meeting, the Commission claimed to have an "open mind" concerning the Newmarket proposal. (Defendant's Exh. 2.) Four days prior, on March 23, 1989, the Economic Development Commission [the "EDC"] held a special meeting at which the Newmarket proposal was discussed as being unsuitable for the IC Zone and at which it was stated that, "if necessary, the interchange regulations should be changed to restrict retail uses." (Record, Item 1n, p. 2.) The EDC communicated its opinions to the Commission by memorandum dated March 28, 1989. (Record, Item 1n, pp. 1-4.) Following the Commission's consultants in the marketing and traffic areas and submitted their names to the Town Planner for approval. (Record, Item 19, p. 5.)
Between March 27, 1989 and April 10, 1989, the Commission drafted the amendment at issue in this appeal. (Record, Item 1m, Letter and proposal from Town Planner to Executive Director, Council of Government of the Central Naugatuck Valley, seeking review and comments.) At its regular meeting on April 24, 1989, the Commission accepted its own application proposing the amendment, set a public hearing date of May 8, 1989, and referred the matter to the Zoning Committee. (Record, Item 2, Minutes, April 24, 1989).
A public hearing on the proposed amendment was properly noticed for May 8, 1989. (Record, Item 1j, Legal Notice.) See Conn. Gen. Stat. 8-3(a)(rev'd to 1989). However, on May 8, 1989, it was noted that the matter had been referred to the Regional Planning Agency for review and the matter was placed on the agenda for June, 1989. (Record: Item 3, Minutes, May 8, 1989; Item 4, Minutes, May 22, 1989.) Subsequently, a public hearing was properly noticed for June 19, 1989, on which date the public hearing was held and closed. (Record: Item 1i, Legal Notice; Item 5 Minutes, June 19, 1989; Item 19, p. 22.)
As already noted, the Commission requested comments from the Zoning Committee, which after tabling the matter several times, voted at its October 11, 1989 meeting to recommend approval of the amendment as modified by the Zoning Committee. (Record: Item 10, Minutes, May 10, 1989; Item 11, Minutes, June 14, 1989; Item 12, Minutes, July 12, 1989; Item 13, Minutes, September 13, 1989; Item 14, Minutes, October 11, 1989; Item 1g, Memorandum to Commission from Zoning Committee, October 12, 1989.) The Commission tabled the matter until its October 23, 1989 meeting, at which time it approved the proposed amendment. (Record: Item 6, Minutes, June 26, 1989; Item 7, Minutes, July 24, 1989; Item 8 Minutes, September 25, 1989; Item 9, Minutes, October 23, 1989.) CT Page 2955
Notice of the Commission's decision was published in the Cheshire Herald on October 26, 1989. (Record, Item 1a, Legal Notice.) The Commission was served on November 9, 1989, within the fifteen (15) day appeal period. See Conn. Pub. Acts. No. 90-286, 1, 3, 9 (1990). The court (Celotto, J.) has already found that Crossroads is aggrieved.
A trial court may grant relief on appeal from a decision of an administrative authority only where the authority has acted illegally or arbitrarily or has abused its discretion. Raybestos-Manhattan, Inc. v. Planning Zoning Commission, 186 Conn. 466,470 (1982). The burden of proof to demonstrate that the local authority acted improperly is upon the plaintiff. Adolphson v. Zoning Board of Appeals, 205 Conn. 703, 707 (1988); Burnham v. Planning Zoning Commission, 189 Conn. 261, 266 (1983). Although raised in the complaint, issues which are not briefed are considered abandoned. State v. Ramsundar, 204 Conn. 4, 16 (1987); DeMilo v. West Haven, 189 Conn. 671, 681-82 n. 8 (1983).
A trial court is not at liberty to substitute its judgment for the wide and liberal discretion vested in the local commission when acting within its prescribed legislative powers. Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 572-73
(1988); Parks v. Planning and Zoning Commission, 178 Conn. 657,663 (1979). A zoning authority must be able to amend its regulations whenever the circumstances or conditions reasonably indicate the need for change. First Hartford Realty Corp. v. Planning and Zoning Commission, 165 Conn. 533, 544 (1973). A zoning authority, in enacting or amending its regulations, acts in a legislative and not an administrative capacity, vesting in its broad discretion. Parks, 178 Conn. at 660. An appeal involving a decision upon an application for a change of zone "require[s] the trial court to review a decision made by the commission in its legislative capacity." Burnham, 189 Conn. at 265. "In such circumstances, it is not the function of the court to retry the case. Conclusions reached by the commission must be upheld by the trial court if they are reasonably supported by the record." Id. "The discretion of the legislative body, because of its constituted role as a formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function." Malafronte v. Planning and Zoning Board,155 Conn. 205, 209 (1967). "The courts allow zoning authorities ["wide and liberal"] discretion in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions which create the problem and shape the solution." Burnham, 189 Conn. at 266 (citation omitted).
 The test of the action of the commission is two-fold: (1) The zone change must be in CT Page 2956 accord with a comprehensive plan, General Statutes 8-2, Summ v. Zoning Commission, 150 Conn. 79, 87, 186 A.2d 160, and (2) it must be reasonably related to the normal police power purposes enumerated in 8-2; [footnote omitted] Summ v. Zoning Commission, supra, 91; see also "The Connecticut Law of Zoning," 41 Conn. B.J. 262, 272.
First Hartford Realty, 165 Conn. at 541.
Crossroads argues in its brief that the amendment of section 48.2 is unsupported by the record, inconsistent with the town's comprehensive plan, in excess of the commission's authority under section 8-3 of the General Statutes in that it violates the uniformity requirement of section 8-2, constitutes spot zoning, and violates the equal protection clause of the fourteenth amendment. Crossroads has not briefed its confiscation claim, and therefore it is deemed abandoned. Ramsundar, 204 Conn. at 16.
Prior to the amendment at issue, section 48 of the Regulations permitted regional shopping centered in the IC Zone by special permit as follows:
 d. Regional Shopping Centers — A regional shopping center is one which contains a wide range of retail businesses, including movie theaters, and accessory uses service [sic] a trade area which embraces a large segment of the community. The center shall contain at least 250,000 square feet of gross leaseable area and be located on a lot of not less than 50 acres.
(Record, Item 1f, Existing and Proposed Text, October 11, 1989.) Following the adoption of the proposed amendment, as modified by the Zoning Committee, section 48.2.d reads as follows:
 d. Regional Shopping Center — A regional shopping center is one which contains restaurants, food service establishments, and a variety of stores selling general merchandise, apparel, furniture, home furnishings, etc. It shall have at least 500,000 square feet of gross leaseable area and may contain one or more full line department stores and movie theaters. The center shall be enclosed. In addition, it should be architectually distinctive, containing high cost finishings and materials, CT Page 2957 special landscaping, or unusual site configuration intended to differentiate it visually from more traditional malls. It shall be located on a lot of at least 50 acres. Only one shopping center of any size shall be permitted in the Interchange Zone.
(Record, Items 1f, 25.) The Zoning Committee modified the proposed amendment by substituting the word "permitted" in the last sentence for "approved" and by deleting a requirement that a shopping center "shall have a trade area of 15 miles or more." (Record, Compare Items 1g and 1h.)
Support in Record for Decision
a. Traffic
In support of its decision to approve the amendment, the Commission stated that more than one regional center in the IC Zone will create additional congestion in the streets. (Record: Item 9, p. 9B; Item 24, Transcript of October 23, 1989 Meeting, p. 2.) Crossroads claims that this conclusion is not supported by the record.
Section 8-2 states that zoning regulations "shall be designed to lessen congestion in the streets." Conn. Gen. Stat. 8-2
(rev'd to 1989, as amended by Conn. Pub. Stat. 8-2 (rev'd to 1989, as amended by Conn. Publ. Acts No. 89-277 (1989)). The Commission asked Wilbur Smith Associates to prepare a traffic report addressing traffic volumes associated with retail shopping centers and office uses. (See Record, Item 19, p. 2.) In that report, John P. Thompson, P.C. of Wilbur Smith Associates states that he is "not sure" that the restriction of mall development "can be accomplished using only traffic transportation issues." He notes that almost any development can be made to operate "at acceptable levels of service" if there is "an unlimited infusion of monies" for roadway/highway improvements and that "if the developer is prepared to commit to these improvements, the basis for denial `inadequate transportation facilities,' can no longer be used." (Record, Item 27 Wilbur Smith Associates Report.) Mr. Thompson suggested that "restrictive (different), zoning would be the town's proper approach to controlling unwanted types of development." He stated, "I wish that I could offer more positive guidance/advice, however, it is difficult, at best, to suggest blanket denials for potential development, based solely on traffic/transportation issues." (Record, Item 27.)
As to the data supplied by Wilbur Smith Associates, Mr. Thompson stated: CT Page 2958
 Relative to traffic generation rates/values for different type developments, attached is a brief summary of rates and resultant traffic volumes for different uses, of a comparable size. These are unadjusted total volumes, without any credits or reductions for possible mixed-use development activities or "pass-by/drop-in" reductions as would normally be applicable to shopping center developments.
 As you will note from your review of the attached table, the traffic volumes associated with Retail Shopping Centers (Malls) are typically higher during both the P.M. peak hour and also on a daily (24 hour) basis than for a comparably sized General Office Building. In effect, subject to the development of an actual distribution routine analysis; what this means is that, the level of off-site traffic/transportation improvements for the Retail Shopping Centers (malls) could be proportionally greater (than for the Office), in order to maintain the same levels of service.
 I know that this rather brief assessment/overview doesn't provide you with all that you are looking for, however, it is the best that can be done, without detailed review of specific development proposals.
(Record, Item 27.)
Eric Brower, a professional planner and Director of Land Use Planning for the law firm of Whitman Ranson and former Director of Planning and Zoning for the Town of Greenwich testified:
 The mere statement of the traffic generation comparing the 500,000 sq. ft. of development office, the 4,587 trips vs. retail at 19,906. At face value, I think that gives you the impression that there would be, obviously, five times the amount of traffic. It's obviously, not that simple. The differences in traffic occur at different times during the day. Office has its peaks, retail has its peaks. The other uses that are permitted for the zone also have varying peak characteristics. So, what I'm saying is there are two ways that the zone might be developed. CT Page 2959 One is if in fact everybody went to the malls, there would come a point in the demonstration of various traffic studies the saturation point had been reached. Clearly there has been none, there has been no development, so we can't find that one mall, two, or any number of malls, would adversely impact the traffic capacity in the area. So, when one is built or proposed, the next mall has to justify itself in terms of its traffic against local road network is able to withstand. It comes to a point where they acceded that and it makes your job very simple. The number of malls presumably would stop right there. I think what you are all aware of from your own regulations is that if the town wishes to be protective of potential impacts of this of any shopping centers or any other use in the town in terms of its stated objectives, health, safety, welfare, comfort, appearance and the like as specified in Section 40.1 and 10, it has in place very comprehensive, thorough and elaborate playing tools.
(Record, Item 19, p. 14) The numbers referred to by Mr. Brower are taken from the Wilbur Smith Associates Report, which notably also shows that during the P.M. Peak hour, a retail development would generate only slightly more than two (2) times the traffic that an office development of the same size would. (Record, Item 27, p. 3.) Mr. Brower also noted that while the rate of trips per 1,000 gross square foot floor area decreases as a shopping center increases in overall size, the act of the Commission in increasing the minimum floor area for shopping centers in the IC Zone from 250,000 to 500,000 square feet allows an increase in total traffic. (Record: Item 31, Comments of Eric Brower p. 2; see Item 27, p. 3.) And when the Commission argues that each mall use will generate an additional 19,906 vehicles per day, it is using the new 500,000 square foot minimum added by the amendment at issue, not the prior 250,000 square foot minimum. (Record, Item 27, p. 3.)
Also, it should be noted that the requirements which must be satisfied to obtain a special permit are set forth in section 40 of the Regulations. Sections 40.4.5 and 40.4.6 contain requirements relating specifically to traffic patterns and congestion. In addition to satisfying the requirements of section 40, one who seeks permission for a development in the IC Zone must satisfy the requirement of section 48.3. Section 48.3.b requires a traffic impact analysis by a licensed traffic engineer covering a list of factors. CT Page 2960
 A traffic impact analysis by a licensed traffic engineer registered in the State of Connecticut shall be required. The report shall include existing and projected traffic volumes (including average daily traffic, peak a.m. and peak p.m.), existing roadway capability, traffic accidents, existing and projected volume/capacity ratios, existing and projected levels of service, general assessment of the local and regional road network and recommended improvements, where applicable.
(Record, Item 25.)
At the public hearing, Andrew Coleman, who represents Joel Banker of Crossroads, objected to the proposed amendment on grounds that the special permit process would allow the Commission to reject any proposal which would have the negative effects which the Commission was seeking to avoid with the proposed blanket prohibition. (Record, Item 19, pp. 4-5.) A similar view was voiced by one Keith Gale of 270 Spruce Street, who opposed inclusion of language in the Regulations which would preclude consideration of other shopping center proposals; (Record: Item 5, pp. 1-2 ; Item 9, pp. 2-4) ; and by Eric Brower; (Record, Item 19, pp. 14-15). Also, Professor Terry Tondro, in a letter to Terry Coates, who also represents Crossroads, stated that "the town can protect itself from excess traffic at the special permit stage . . ., when everyone will have the benefit of traffic studies showing just what the traffic will be based on actual development proposals." (Record, Item 28, Tondro Letter, p. 4.)
Professor Tondro also pointed out that the Commission could condition a special permit on the undertaking by the applicant of steps necessary to achieve proper traffic patterns, as was done with Errichetti Associates' permit. (Record: Item 28, p. 4; Item 33, p. 3.) This point was reiterated by the president of Barkman 
Mess Associates, Inc. Traffic Engineers and Transportation Planning, based on a review of the traffic study which preceded the creation of the IC Zone:
 The existing roadways, for the inhanced by modification as stipulated by the State Traffic Commission in the approval of the individual developments, will be able to accommodate large traffic volumes safety and efficiently well into the foreseeable future. Therefore, we believe that the revised regulation should not restrict development to CT Page 2961 only a single shopping center in the Interchange Zone.
(Record, Item 32, Barman Mess letter to Joel Banker.)
The Commission points out that road improvements over which it has no control are not to be considered as support for a zone change unless there is a reasonable probability that they will be instituted. Jarvis Acres, Inc. v. Zoning Commission, 163 Conn. 41,51 (1972); Wilson v. Planning and Zoning Commission, 162 Conn. 19,24-5 (1971). Mr. Thompson's report simply indicates that almost any conscionable development proposal could be accommodated with infusion of unlimited funds, not that any and all proposals would require unlimited or even extensive funds. Furthermore the report and the comments of others discussed above indicated that as long as the developer agrees to bear the cost as a condition to the special permit approval, traffic congestion will not be a factor on which a proposal could be denied. Indeed, the Commission has already conditioned one special permit for development in the IC Zone on roadway improvements. (Record, Item 33.)
Crossroads concludes that even Mr. Thompson, the Commission's own traffic expert, could not state that traffic considerations would support the proposed amendment. (Record, Item 27.) Furthermore, Crossroads argues, the numbers reported by Mr. Thompson do not show that congestion in the streets will be created or increased. "It is not the over-all volume of daily traffic, but `congestion in the streets' that is, density of traffic which is referred to in the statute [section 8-2]." Jarvis Acres, 163 Conn. at 49.
The Commission points out that the "credibility of witnesses and the determination of issues of fact are matters solely within the province of the agency." Burnham, 189 Conn. at 265. The Commission also argues that its members are entitled to rely on their own personal knowledge of traffic congestion and, therefore, that its decision on that matter does not have to be supported by evidence. (Defendant's Brief, July 12, 1989, p. 16.) In Feinson v. Conservation Commission, 180 Conn. 421, 427 (1980, the court stated that "lay members of commissions [are permitted] to rely on their personal knowledge concerning matters readily within their competence, such as traffic congestion and street safety." (Citations omitted).
It has been held that commission members may rely on their personal knowledge and conclusion therefrom to determine the impact of a future or proposed development on local traffic. See Primerica v. Planning Zoning Commission, 211 Conn. 85, 97-8
(1989); Dram Associates v. Planning Zoning Commission, 21 Conn. App. 538,, CT Page 2962 541-42 (1990); Central Bank for Savings v. Planning 
Zoning Commission, 13 Conn. App. 448, 455-56 (1988); Forest Construction Co. v. Planning Zoning Commission, 155 Conn. 669,675 (1967). The local authority is not bound to adopt the opinion of a traffic engineer. Gulf Oil Corporation v. Board of Selectmen, 144 Conn. 61, 65-6 (1956). However, that a commission may rely on its knowledge about traffic conditions to the exclusion of an expert's opinion does not mean that its conclusions need not be reasonable or supported by the record. Primerica, 211 Conn. at 97-8, 99-101.
In the instant case, the evidence cited by the Commission to show that it was relying on its own knowledge with regard to traffic matters is as follows: At the October 11, 1989 meeting of the Zoning Committee, Mr. Jones, a member, stated:
 . . . I'd be somewhat afraid of any more of one simply on a traffic point of view. I think with one mall developer, they're going to have to address the needs of whatever traffic influx is going to take place there, and that will just be part of the development package, I'm sure. But any additional retail would only introduce that much more of a traffic problem and, I think, we only need the traffic that is going to be generated by the one area. So I would be in favor of this change also.
(Record, Item 23, Transcript of October 11, 1989 meeting, pp. 2-3.) Also at that meeting, Mr. Bruno, a member, stated:
 . . . Since the adoption of the regulation, I think the traffic on Route 10 has changed substantially. And, especially in the north end and, at this point, we would be warranted in changing the regulation to make sure that it is only one because of the increased traffic that a retail mall would generate out there in addition to what has already been approved. So I don't have any hesitation talking about the traffic because it has changed substantially just since the adoption of the regulation four or five years ago.
(Record, Item 23, p. 3.) Mr. Babcock, a member, then stated:
 On that traffic issue, as I recall, there were some studies that were done that showed clearly that there was a complement between the traffic having the one mall, but there is CT Page 2963 different traffic times that would make it clear to me that to bring in another mall or more retail shopping in the area is going to heighten the traffic that already could be a peak time with the one mall. So I think that to limit it would be, again, a proven judgment.
(Record, Item 23, p. 3.) Mr. Pfurr, Town Planner, had earlier told the Zoning Committee, at the beginning of the meeting, that traffic studies indicated that malls will generate five (5) times the amount of traffic as office space. (Record, Item 14, p. 1.)
At the Commission's October 23, 1989 meeting, Mr. Bruno reiterated his opinion: "I think the traffic is questionable at this point, whether or not we should allow even one out there, but certainly not more than one." (Record, Item 24, p. 3.) Mr. Plurr stated:
 . . . Population has increased and traffic flow has intensified. Cheshire already has a serious traffic congestion on Route 10 as well as other of its local highways. The increase in traffic such as that which may be expected with more than one regional shopping center will serve to create additional congestion on our streets, streets not designed to handle such traffic volumes. . . .
(Record, Item 24, p. 2.)
While more than one conclusion could be reached on this record, it cannot be stated that the Commission acted arbitrarily, illegally or in abuse of its discretion in concluding that more than one regional shopping mall in the IC Zone would create or worsen congestion in the streets.
b. Environmental Impact
The Commission also based its decision on "the potential of multiple regional shopping centers to increase pollution of the natural resources." (Record, Item 9, p. 9C.) Pursuant to section8-2 of the General Statutes, zoning regulations "shall be made with reasonable consideration for the protection of existing and potential public surface and ground drinking water supplies."
Expert testimony is "required when the question involved goes beyond `the ordinary knowledge and experience' of the trier of fact." Feinson, 180 Conn. at 428 (citations omitted). A "lay commission acts without substantial evidence, and arbitrarily, CT Page 2964 when it relies on its own knowledge and experience concerning technically complex issues such as pollution control. . . ." Id. at 429.
The record contains no expert evidence on the issue of pollution. The Commission merely relies on those instances in the record when members voiced general concerns over "the aquifer" and speculated about what "the water company" might "like to see." (See Record, Item 9, p. 9; Item 14, p. 2; Item 23, pp. 304; Item 24, pp. 3-4.
Therefore the Commission acted improperly insofar as it based its decision on the issue of environmental impact.
c. Protection From Individuals Bent on a Criminal Purpose
The statement which sets forth the Commission's reasons for adopting the amendment includes the following:
 This Commission has also given consideration to the potential of multiple regional shopping centers to attract a large number of people — including those bent on a criminal purpose. The Town's zoning regulations must be designed to help protect the public health and safety against that type of a threat.
(Record, Item 9, p. 9C.) However, this "reason" was never mentioned or discussed by the Commission and appears only in the motion drafted by Town Attorney Knott. (Record, Item 9, pp. 9, 9A-9D.) Even if the Commission could rely on its own knowledge and experience of matters relating to crime, "[i]f an administrative agency chooses to rely on its own judgment, it has a responsibility to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the administrative proceedings." Feinson, 180 Conn. at 428-29. (citations omitted).
Therefore, this Court finds that the Commission acted improperly insofar as it offered protection from crime as a reason to justify its decision.
d. Original Intent of Commission
The record is replete with comments to the effect that the Commission originally intended to allow only one regional shopping center in the IC Zone, and the Commission now argues that the amendment is proper because it was adopted to reflect that intent. CT Page 2965 Crossroads argues that legislative intent is determined by the regulations themselves.
"The principles governing interpretation of zoning regulations are well settled. Promulgation of zoning regulations is a legislative process, although local in scope." Planning and Zoning Commission v. Gilbert, 208 Conn. 696, 705 (1988) (citation omitted.) "We interpret an enactment to find the expressed intent of the legislative body from the language it used to manifest that intent." Id. (citation omitted) (emphasis added). "Zoning regulations. . . cannot be construed to include or exclude by implication what is not clearly within their express terms." Id. (citations omitted). Where the language used by the legislative body is plain and unambiguous, there is no room for statutory construction by the courts and the enactment will be applied as its words direct. Kelemen v. Rimrock Corporation, 207 Conn. 599,606 (1988).
The language of the interchange regulation prior to the amendment in no way expresses an intent to limit the number of regional shopping centers. While the Commission has the authority to promulgate and amend regulations under section 8-2 of the General Statutes. The mere fact that the Commission amends a regulation to correct a prior failure to express its intent does not, in and of itself, make that amendment proper. Legislative action by a zoning commission must be in accord with a comprehensive plan and be reasonably related to the police power purposes enumerated in section 8-2. First Hartford Realty,165 Conn. at 541; Conn. Gen. Stat. 8-2 (rev'd to 1989, as amended).
Therefore even if the amendment was designed to correct an error, as the Commission argues, this fact alone does not establish the legality of the correction and, thus, cannot, without more, support the Commission's decision.
e. Size of Regional Shopping Centers
Crossroads argues that there was insufficient evidence to support the dramatic increase in the minimum required floor area for regional shopping centers from 250,000 to 500,000 square feet. Crossroads claims that "if traffic conditions were the real motivation for the amendment, the obvious response would be to reduce, rather than increase, the minimum floor for regional shopping centers." (Plaintiff's Brief, January 30, 1991, p. 11, emphasis in original.) The real reason for the increase, claims Crossroads, was to exclude the Newmarket proposal while protecting AVM. The Commission argues that it reasonably concluded from the evidence that a single shopping mall of 500,000 square feet could be accommodated in the IC Zone while multiple malls of 250,000 square feet or more could not. CT Page 2966
Section "8-2 authorizes the enactment of minimum floor regulations. . . ." Builders Service Corporation v. Planning 
Zoning Commission, 208 Conn. 267, 268 (1988). However, a minimum floor area regulation, like any regulation, must constitute a reasonable exercise of the police power, which means it must have a reasonable relation to the public health, safety and welfare and other police power purposes enumerated in section 8-2. Id. at 289; First Hartford Realty, 165 Conn. at 541.
As already noted, the Wilbur Smith Associates Report shows that the rate of trips decreases as the size of the shopping center increases. (Record, Item 27, p. 3; Item 31, p. 2.) Also, as discussed above, the Commission properly ruled on its own knowledge and observation of traffic conditions.
The Commission could have reasonably concluded that one 500,000 square foot mall would generate less traffic and therefore promote safety better than two (2) or more 250,000 square foot malls. The fact the AVM as proposed and approved happens to be greater than 500,000 square feet and the Newmarket proposal is less than 500,000 square feet does not require a finding that the Commission's decision is unreasonable or without support in the record.
Comprehensive Plan
An amendment to the zoning regulations must be in accord with the comprehensive plan. First Hartford Realty, 165 Conn. at 541.
 "A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to present and potential use of the properties." (Citation omitted). The requirement of a comprehensive plan is generally satisfied when the zoning authority acts with the intention of promoting the best interests of the entire community. (Citation omitted).
Id.
Crossroads argues that the Commission granted a monopoly to the AVM and that the common good is not furthered through the grant of a monopoly. Crossroads claims that the amendment, "with its grant of an exclusive franchise and its discriminatory and preclusive impact on other property owners in the I.C. Zone, evidences neither reasoned discretion or an intent to further the common good." (plaintiffs' Brief, June 25, 1990, p. 32.) CT Page 2967
Where the town has not adopted a masterplan, the comprehensive plan is to be found in the zoning regulations themselves and in the zoning map. Parks, 178 Conn. at 661. The Commission argues, and it appears, that Cheshire's comprehensive plan is found in its zoning regulations and map. (See Record, Item 25, 11, 11.1-11.4.)
The general intent of the zoning regulations in Cheshire are similar to the purposes set forth in section 8-2. (See Record, Item 25, 11.) See Conn. Gen. Stat. 8-2 (rev'd to 1989, as amended). Where this is the case, the court must determine if the amendment in question could reasonably fall within the provisions of that statute. Parks, 178 Conn. at 661.[1] Even where one of the commission's reasons for approving an amendment is to benefit a specific enterprise, so long as the change in addition benefits the community as a whole, the commission cannot be said to have acted improperly. Id. at 662; see also Coyle v. Planning Zoning Commission, 162 Conn. 233, 235-36 (1972); Damick v. Planning 
Zoning Commission, 158 Conn. 78, 85 (1969) (where change of zonal classification was for sole benefit of individual and was detrimental to others, change was at odds with comprehensive plan.)
One of the Commission's reasons for approving the amendment was traffic congestion, and thus is a proper reason for acting under section 11.4 of the Regulations and section 8-2 of the General Statutes. (Record, Item 25, 11.4.) Conn. Gen. Stat.8-2 (rev'd to 1989, as amended). As stated, the Commission's decision with regard to traffic is supported by the record. Therefore the Commission's decision can be said to benefit the community as a whole. There is no evidence that the amendment thwarts the purpose of the Interchange Zone Regulations as stated in section 48.1. Nor does it appear that the amendment was approved solely for the benefit of AVM, even through AVM may receive incidental benefits from the amendment. Unlike the situations in Parks, Coyle, and Damick, the individual who receives the benefit of the amendment did not propose or request it. See Parks, 178 Conn. at 658; Coyle, 162 Conn. at 235; Damick,158 Conn. at 82. It appears that the Commission sought to limit the number of shopping centers to one, not specifically to the one known as AVM. (See Record, Item 24.)
Accordingly, the record reasonably supports a finding that the amendment is in harmony with the comprehensive plan.
Uniformity Requirement
Plaintiff claims that the Commission exceeded its authority under section 8-3 of the General Statutes to amend the Regulations CT Page 2968 because the amendment violates the uniformity requirement of section 8-2. Section 8-2 provides, in part, that all "regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district. . . ." Conn. Gen. Stat.8-2 (rev'd to 1989, as amended); see Veseskis v. Bristol Zoning Commission, 168 Conn. 358, 360 (1975). Section 8-3 "sets forth the procedure by which the regulations enacted pursuant to 8-2
may be enforced, amended or changed." Veseskis, 168 Conn. at 360; see Conn. Gen. Stat. 8-3 (rev'd to 1989, as amended by Conn. Pub. Acts No. 89-345, 10, 11 (1989).
In Veseskis, the court stated :
 Nothing in 8-3, however, abrogates the express requirement of 8-2 that such regulations shall be uniform. The obvious purpose of the requirement of uniformity in the regulations is to assure property owners that there shall be no improper discrimination, all owners of the same class and in the same district being treated alike with provision for relief in cases of exceptional difficulty or unusual hardship by action of the zoning board of appeals.
Veseskis, 168 Conn. at 260 (citations omitted). The court held that to require by regulation the creation of a 200 foot buffer strip on the edge of property as a condition to is being rezoned was a violation of the uniformity requirement:
 To require by zoning regulation a buffer strip between one zone of a particular classification and another zone of a different class in one specific instance and not in other instances when zones of these two classifications abut clearly violates the statutory uniformity requirement and is exactly the arbitrary and discriminatory use of the police power which the statute was designed to prevent.
Id. (citations omitted); see also Bartsch v. Planning Zoning Commission, 6 Conn. App. 686, 690-91 (1986) (facts nearly identical to those in Veseskis). Besides Veseskis, Crossroads cites no case law in support of its argument. Yet, unlike Veseskis, the instant case does not involve a conditional amendment. The amendment at issue here does not single out any parcel within the IC Zone and impose additional or different requirements. Rather, the amendment applies uniformly to every parcel in the IC Zone. CT Page 2969
In his letter to plaintiff's attorney, Professor Tondro states that "zoning for commercial uses always limits competition in an abstract sense, since the size of the commercial zone and the limitations on building size within the zone mean that only a certain amount of floor space can be used for commercial purposes. When that space is spoken for, no additional commercial uses can come into town." (Record, Item 28, p. 1.) Professor Tondro goes on to say, however, that the amendment goes too far because the Commission is deciding that a particular landowner, Errichetti Associates, is to be the operator of all of the shopping center space allowed in Cheshire. (Record, Item 28, p. 2.)
However, it is not the amendment but the existing special permit which authorizes the AVM. (See Record, Item 33.) Special permits are exceptions to the uniformity rule. See Conn. Gen. Stat. 8-2 (rev'd to 1989, as amended.)[2]
The amendment does not offend the uniformity requirement of section 8-2 and, therefore, the Commission did not exceed its authority under section 8-3 in approving the amendment.
Spot Zoning
Crossroads claims that the amendment constitutes spot zoning. The Connecticut Supreme Court has stated:
 Spot zoning has been defined as "a provision in a zoning plan, or a modification in such a plan, which affects only the use of a particular piece of property or a small group of adjoining properties and is not related to the general plan for the community as a whole." Eden v. Town Plan Zoning Commission, 139 Conn. 49, 63, 89 A.2d 746. In that case we also quoted with approval a definition of spot zoning as an "attempt to wrench a single small lot from its environment and give it a new rating that disturbs the tenor of the neighborhood."
Guerriero v. Galasso, 144 Conn. 600, 606-07 (1957). To determine whether a commission has engaged in spot zoning, the courts apply the following test:
 [T]wo elements must coexist in order to constitute spot zoning in the sense of an illegal exercise of power on the part of the zoning authority. First, there must be a change of zone applicable only to a small area. Second, this change must be out of harmony with the comprehensive plan for the good of the CT Page 2970 community as a whole.
Id. at 607 (citation omitted) (emphasis added).
It has already been stated that the amendment does not offend the comprehensive plan. Therefore, the amendment cannot constitute spot zoning.
Equal Protection
Crossroads claims that the amendment affects similarly situated property owners in differing manners and, therefore, violates the equal protection clause of the fourteenth amendment. Crossroads argues that the amendment "created two classes, those that could develop regional shopping centers and those who could not" and "bears no `rational relation to the public health, safety and welfare.'" (Plaintiff's Brief, June 25, 1990, p. 38.)
The Connecticut Supreme Court has stated:
 A legislative body is allowed wide discretion in the selection of classes although the equal protection clause requires that a zoning ordinance be applied in like manner to all those who are similarly situated. Barrett v. Indiana, 229 U.S. 26, 29, 30, 33 S.Ct. 692, 57 L.Ed. 1050. "The Fourteenth Amendment is not a pedagogical requirement of the impracticable. The equal protection of the laws does not mean that all occupations that are called by the same name must be treated in the same way. . . . If in its theory the distinction is justifiable. . . the fact that some cases. . . are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the distinctions are distinctions of degree; and the constant business of the law is to draw such lines." Dominion Hotel, Inc. v. Arizona, 249 U.S. 265, 268, 269, 39 S.Ct. 273, 274, 63 L.Ed. 597
(Holmes, J.).
Dupont v. Planning Zoning Commission, 156 Conn. 213, 218-19
(1968).
 In order to hold a zoning regulation unconstitutional as violative of the due process of law or equal protection clauses of the state or federal constitution, it must appear "that . . . [the] provisions are clearly arbitrary and unreasonable, having no substantial relation to CT Page 2971 the public health, safety, morals, or general welfare." Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303, State v. Hillman. 110 Conn. 92, 105, 147 A. 294.
St. John's Roman Catholic Church Corporation v. Darien, 149 Conn. 712,722 (1962).
Where a governmental classification does not involve a fundamental right or such sensitive classifications which call for an intermediate review, the governmental action is permissible as long as there is a "rational basis" for it. Carofano v. Bridgeport, 196 Conn. 623, 638-43 (1985). "[Z]oning restrictions, so far as they reasonably promote public health, safety, and welfare without depriving landowners of all economically viable use of their property, are constitutional even though the effect of the restrictions may be to limit the exercise of private property rights." Husti v. Zuckerman Property Enterprises, Ltd.,199 Conn. 575, 580 (1986) (citations omitted), appeal dismissed,479 U.S. 802. "Zoning regulations enjoy a presumption of constitutionality and the party challenging the ordinance has a heavy burden of proving their unconstitutionality beyond a reasonable doubt." Beacon Falls v. Posick, 212 Conn. 570, 585
(1989) (citation omitted).
As stated, the amendment applies to all property in the IC Zone uniformly. The amendment is reasonably related to the police power purposes enumerated in section 8-2, i.e. the public health, safety, etc. Therefore, Crossroads has not demonstrated that the amendment violates the equal protection clause beyond a reasonable doubt.
The appeal is dismissed.
The Court wishes to commend all counsel on the excellence of their briefs.
Donald J. Celotto, Judge
ENDNOTES