## AFSCME, COUNCIL 4, LOCAL 681, AFL-CIO v. CITY OF WEST HAVEN

SUPERIOR COURT  JUDICIAL DISTRICT OF  FILE No. 704841 S
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed June 2, 1994

*Gagne & Associates* and *Harry B. Elliot, Jr.,* for the plaintiff.

*Shipman & Goodwin,* for the named defendant.

*William J. Prensky,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendant West Haven finance and assistance board.

SHELDON, J. The plaintiff, American Foundation of State, County and Municipal Employees, Council 4, Local 681, AFL-CIO (union), has applied to this court under General Statutes § 52-418 to vacate an interest arbitration award by which, on December 14, 1993, the defendant West Haven finance planning and assistance board (board) established the terms and conditions of the new municipal employment contract between the defendant city of West Haven (city) and the city's union employees. Acting under the authority of Special Acts 1992, No. 92-5 (special act), where the General Assembly granted the city the right to issue state-guaranteed municipal bonds on the condition that it submit to a series of strict financial controls—including oversight by the board, which would come into existence upon the issuance of such bonds and be empowered, inter alia, to serve as the binding arbitration panel in all con-

tract disputes between the city and its unions—the board issued its award after conducting five days of evidentiary hearings, receiving and considering the last best offers of the city and the union, and reviewing extensive posttrial briefs of counsel on the forty-one issues in dispute.

The union now complains that the board's award must be vacated because the board was illegally established, illegally empowered to arbitrate labor disputes between the city and its unions, and illegally authorized to conduct arbitration proceedings in a manner which violates the statutory and constitutional rights of the union and its employees. It claims, more particularly, that the award challenged here must be vacated for the following reasons. First, the special act that created the board and empowered it to serve as the binding arbitration panel in all labor disputes between the city and its unions is unconstitutional, because the legislature that enacted it lacked the constitutional authority to do so under any of the limited exceptions to the general proscription against "special legislation relative to the powers, organization, terms of elective office or form of government of any single town, city or borough," set forth in article tenth, § 1 (home rule article), of the 1965 constitution of Connecticut. Second, the special act was enacted in violation of General Statutes § 2-14, because it was not requested either by a formal resolution supported by a two-thirds vote of the West Haven city council or by a petition signed by at least 10 percent of the city's electors. Third, by so defining the legal responsibilities of the board as to make the preservation of the city's financial resources its highest priority, the special act requires board members, and thus must here be presumed to have caused them, to act with "evident partiality" toward the city, in violation of General Statutes § 52-418 (a) (2). Fourth, the special act discriminates against the union and its

members and denies them equal protection of the law, in violation of article first, § 20, of the 1965 constitution of Connecticut, because the procedures it establishes for the conduct of binding interest arbitration between the city and its workers unjustifiably deny city workers many of the rights and protections which the workers of other towns and cities enjoy under General Statutes § 7-467 et seq., the Municipal Employee Relations Act (MERA). Finally, by affording the city the aforementioned advantages in its contract negotiations with its employees, the General Assembly, claims the plaintiff, acted with "the sole objective [of granting] personal gain and advantage to the City, [and must therefore be deemed to have granted] exclusive public emoluments or privileges to the City without serving or furthering a public purpose, in violation of Article First, Section [1] of the [1965] Connecticut Constitution." Because the court finds that none of these claims has merit, it concludes that the union's application to vacate the challenged arbitration award must be denied.

### FACTUAL AND PROCEDURAL HISTORY

In early 1992, shortly after the city's present administration took office, city officials learned that the city's financial condition was extremely precarious. An audit report presented to the new administration on January 31, 1992, showed an actual deficit of $6.9 million for the 1990–91 fiscal year, which had ended on June 30, 1991. See 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1051–56, remarks of Representatives Dale Radcliffe and Joseph Adamo. Indeed, despite its size, this deficit proved difficult to document because members of the previous administration had removed cartons of city documents from city buildings when they left office, and failed to return any of them until arrests were threatened. Id., pp. 1054–55, remarks of Representative Joseph Adamo. By the time city officials learned

of the $6.9 million deficit from the preceding fiscal year, the city had developed an actual deficit for the current fiscal year as well. Id., pp. 1055–56, remarks of Representative Joseph Adamo. As of April 1, 1992, it was projected that by June 30, 1992, the end of the current fiscal year, the size of the city's deficit would reach $10.2 million. Id., pp. 1063–64, remarks of Representative Joseph Adamo.

Several factors had contributed to these deficits. Important among them were the ongoing economic recession, which had taken its toll in West Haven much as it had in other Connecticut municipalities, and a recent history of poor financial management by the city's previous administration.[1] The combined effect of these factors put the city in immediate danger of defaulting on its long-term obligations and of being unable to pay for even the most essential community services.

Aware that the city's budgeted expenses far outstripped its current financial resources, the city's new leaders took several steps to ameliorate the situation, including: borrowing money by the issuance of bond anticipation notes; attempting to reopen union contracts; laying off thirty-six teachers; exploring the possibility of laying off forty-five municipal workers; and investigating the legality of levying an income tax on

[1] For example, against the advice of West Haven's state legislators, the city's previous administration included in its 1991–92 budget a school construction grant of $7 million, despite the fact that the grant had not been approved and would certainly not be paid in full in that fiscal year. In fact, the grant was later approved for only $3.8 million. 35 S. Proc., Pt. 3, 1992 Sess., p. 863, remarks of Senator Charles Allen; 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1063–64, remarks of Representative Joseph Adamo. Relying on such falsely optimistic estimates, the city had lowered its mill rate by 3.2 mills for the 1991–92 fiscal year. At the same time, city spending increased by 10 percent. 35 S. Proc., Pt. 3, 1992 Sess., p. 864, remarks of Senator Charles Allen; 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1060–61, remarks of Representative Joseph Adamo.

city residents to raise additional revenues. Regrettably, these measures proved insufficient to nurse the city back to economic health. 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1059, 1061 and 1065–66, remarks of Representative Joseph Adamo. By March, 1992, the city faced an extreme shortage of cash. It had no funds with which to meet its payroll obligations after May 1, 1992, and would meet payroll up to that date only with an emergency advance of education cost sharing grant funds from the state. Id., pp. 1112–13, remarks of Representative Joseph Adamo. What is more, on April 1, 1992, the city was informed that its bond rating had been downgraded to the point that its bond anticipation notes could not be sold.

The potential consequences of the city's cash flow problem were as dire as they were immediate: city schools, unfunded, would have to be closed long before the state-mandated end of the academic year; police services would disappear; public beaches would have to be closed at the very moment when demand for their use would be the greatest; and, most critically, the sewage treatment plant serving both the city of West Haven and the neighboring town of Orange would have to be shut down, thereby imperiling the health of state citizens both within and without the city's borders. Id., p. 1050, remarks of Representative Raymond Collins.

Against this background, the city's new leaders sought state assistance in the form of bond guarantees. These guarantees, it was thought, would return the city's bonds to marketable status, and thereby allow the city both to refinance its deficit and to borrow sufficient cash to survive the immediate crisis.

In response to this request, members of the state's office of policy and management worked with the city's bond counsel and state representatives to draft legislation that would grant the city immediate relief from

the current emergency. 35 S. Proc., Pt. 3, 1992 Sess., pp. 861, 865 and 874, remarks of Senator Charles Allen; 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1084–86, remarks of Representative Joseph Adamo.

On March 31, 1992, the city's financial advisors, bond counsel, mayor, state legislators and city council met to discuss the city's crisis. The financial advisors and bond counsel explained both the likely immediate consequences of default on the city's various notes and the long-term consequences such a defaiult would have, extending for decades, on investors' views of the city's credit worthiness. They further explained that the state, having previously guaranteed loans for the city of Bridgeport, then being forced to contest Bridgeport's attempt to declare bankruptcy, would not give the city any assistance unless sufficiently strong controls were in place to assure that the city could not put itself "back into the same box within two years." After extensive discussion and subsequent party caucuses, the West Haven city council unanimously supported the proposed legislation before its representatives presented the bill to the General Assembly. 35 S. Proc., Pt. 3, 1992 Sess., p. 876, remarks of Senator Max Case; 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1049–50, remarks of Representative Raymond Collins.

To ensure that the city did not default on the bonds and bond anticipation notes that would be guaranteed by the state, the drafters of the legislation provided a series of extraordinary, but temporary, measures. Upon the city's issuance of any debt instrument guaranteed by the state under this legislation, the special act established the West Haven finance planning and assistance board, with broad oversight powers, including the power to approve or disapprove budgets, to review and approve the city's financial plans, to approve or reject all collective bargaining agreements, to serve as the binding arbitration panel with respect

to labor contracts, and to review and approve or disapprove all contracts involving the expenditure of more than $50,000. Special Acts 1992, No. 92-5, §§ 6–7. Under the terms of the special act, the board would continue in existence only until the operating funds of the city were in balance for two consecutive fiscal years and the city's projected positive operating fund balances for the three succeeding fiscal years. Special Acts 1992, No. 92-5, § 12.

In debating passage of the special act, the members of the General Assembly recognized the extraordinary nature of both the relief requested by the city and the powers granted to the board. Legislators, however, felt that the proposed legislation represented a necessary compromise. It offered the immediate financial relief needed to prevent the shutdown of essential city services, but imposed stringent controls both to protect the financial interests of the state and to deter other communities from turning lightly or prematurely to the state for financial assistance. Further, legislators found that allowing the city to default on its existing obligations and then to seek relief through bankruptcy proceedings would adversely affect the state's efforts to rebuild Connecticut's economy. 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1107–1109, remarks of Representative Robert Ward.

In passing the special act, legislators carefully considered the state constitutional authority for such legislation and the supersession of conflicting statutory and city charter provisions. The proponents of the legislation cited the constitutional authority for the provision and described their understanding of the reach of the supersession section. 35 S. Proc., Pt. 3, 1992 Sess., pp. 875–88, remarks of Senator Max Case et al. 35 H.R. Proc., Pt. 4, 1992 Sess., pp. 1069–77 and 1093–1115, remarks of Representative Dale Radcliffe et al. The legislation was approved by a vote of 125 to 18 in the

House of Representatives and by a vote of 30 to 2 in the Senate. 35 H.R. Proc., Pt. 4, 1992 Sess., p. 1121; 35 S. Proc., Pt. 3, 1992 Sess., p. 892.

On April 11, 1992, approximately one week after the enactment of the special act, the West Haven city council requested that the state guarantee bond anticipation notes and bonds in the total amount of $12,000,000. The state guaranteed the requested debts and, by operation of § 6 of the special act, the West Haven finance planning and assistance board came into existence.[2]

On June 30, 1993, the collective bargaining agreement between the union and the city expired. Approximately two months before that date, the parties had entered into negotiations for another agreement. When they were unable to reach an agreement on all disputed issues, the board imposed binding arbitration. The union raised no objection to the imposition of arbitration, to the arbitration procedures, or to the board's role as arbitration panel under the special act.

Acting as the arbitration panel pursuant to § 7 (b) of the special act, the board held hearings on August 17, 21, 24 and 25, and on September 2, 1993. At those hearings, both parties were represented and were allowed full opportunity to present evidence and to examine and cross-examine witnesses. Following the hearings, both the city and the union presented last best offers on the issues in dispute, as well as posthearing briefs. The board issued the arbitration award on December 14, 1993.

---

[2] At the time of the arbitration, the following individuals were serving as members of the board: Douglas Cutler, chairman, who was the designee of William Cibes, secretary of the office of policy and management; H. Richard Borer, mayor of the city of West Haven; Jill Ferraiolo, designee of Joseph Suggs, the state treasurer; and four gubernatorial appointees, Richard Grossi, Sharon Palmer, Fred Sammis and Richard Treibick. As required by the special act, one of the gubernatorial appointees, Palmer, was a representative of organized labor.

## I

The union's initial claim on this motion to vacate is that that portion of the special act that created the board and gave it the power to control labor negotiations between the city and its unions is unconstitutional because it is "special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough" which is not justified under any of the limited exceptions to the general prohibition against such legislation set forth in article tenth, § 1, of the 1965 constitution of Connecticut. Article tenth, § 1, first became a part of the Connecticut constitution in 1965, when it was adopted by the constitutional convention as part of a reform that restructured the General Assembly by doing away with the preexisting requirement that every town and city be represented by at least one state representative. To assure local leaders that their loss of direct representation in Hartford would not result in a corresponding loss of local autonomy over local affairs, the convention, in article tenth, § 1, of the constitution of Connecticut, imposed the following restrictions upon the power of the General Assembly to enact special legislation relative to the powers, organization or form of government of any single Connecticut municipality: "After July 1, 1969, the general assembly shall enact no special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough, except as to (a) borrowing power, (b) validating acts, and (c) formation, consolidation or dissolution of any town, city or borough, unless in the delegation of legislative authority by general law the general assembly shall have failed to prescribe the powers necessary to effect the purpose of such special legislation."

The union acknowledges that as much of the special act as explicitly permits the city to issue state-guaranteed municipal bonds is constitutionally appropriate legislation under the "borrowing power" exception set forth in article tenth, § 1 (a). It contends, however, that the remaining provisions of the special act, including those which established the board and empowered it to approve or reject the city's collective bargaining agreements and to serve as the binding arbitration panel in the city's contract disputes with its unions, are unconstitutional because they have nothing to do with the city's borrowing power and are not otherwise justified under article tenth, § 1.

The board and the city disagree with the union for several reasons. First, they contend that the court lacks subject matter jurisdiction over this portion of the union's claim because the union lacks standing to challenge the constitutionality of legislation under article tenth, § 1. Second, they argue that even if the union does have standing to bring the present challenge, the challenge itself is without merit because the special act is justified under two distinct exceptions to the general prohibition under article tenth, § 1, against special legislation relative to the powers, organization, terms of elective office or form of government of any single town, city or borough, to wit: the aforementioned exception for special legislation as to the borrowing power of a single municipality; and the exception for special legislation concerning matters as to which the General Assembly has as yet failed to delegate by general law the powers necessary to effect the purpose of the special legislation. For the following reasons, the court concludes that although the union has standing to pursue the present challenge, the special act is indeed constitutional under both exceptions relied on by the city and the board.

Standing depends, in the first instance, upon a party's proof of aggrievement. *Hartford Federal Savings & Loan Assn.* v. *Tucker,* 13 Conn. App. 239, 245, 536 A.2d 962, cert. denied, 207 Conn. 805, 540 A.2d 373 (1988). The following two-part test for aggrievement is well established. First, the party claiming aggrievement must successfully demonstrate a "specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole." *Nader* v. *Altermatt,* 166 Conn. 43, 51, 347 A.2d 89 (1974). A "professed concern for obedience to law and the just disposition of every judicial or administrative proceeding" is inadequate to establish such a specific, personal and legal interest. (Internal quotation marks omitted.) Id., 55. Second, the party claiming aggrievement must show that "this specific, personal and legal interest has been specially and injuriously affected" by the challenged action. Id., 51. A mere speculative injury, such as a suggestion of economic disadvantage caused by competition in the marketplace, is not sufficient to establish such injury. *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* 226 Conn. 105, 127, 627 A.2d 1257 (1993).

In the present case, the union is aggrieved by the challenged legislation because both it and its members have a special interest in collective bargaining about the terms and conditions of their own employment which is far more direct and substantial than that of any common citizen. That interest, moreover, has been materially affected by the legislation to the extent that it has explicitly taken from them certain rights they would otherwise have enjoyed under MERA. Under MERA, the union's members would have had the right freely to negotiate a contract with the city's bargaining representative without outside oversight by a state

agency responsible for maintaining the city's fiscal integrity. Under the special act, by contrast, the board is given the specific power to reject any such contract if, in its judgment, city finances so require. Under MERA, all binding arbitration proceedings are conducted before a three person panel composed of one representative each from the union and the muncipality and one neutral member. Under the special act, however, the board itself serves as the binding arbitration panel. Finally, under MERA, the union has the right to have the arbitration panel choose between its own and the municipality's last best offers as to each contested issue in dispute; the board, however, can refuse to accept either side's final offer, imposing its own terms and conditions instead.

Whether the aforementioned special procedures actually violate article tenth, § 1, it is clear that the union has the kind of direct, immediate interest in contesting them which the standing requirement is intended to ensure. The new provisions directly and explicitly limit the bargaining rights of the union's members in negotiating the terms and conditions of their own employment. Their interests are, therefore, so affected by the challenged legislation as to establish their aggrievement under prevailing legal standards.

In addition to showing aggrievement, however, a party must show that the interest it seeks to protect is "arguably within the *zone of interests* to be protected or regulated by the statute or constitutional guarantee in question." (Emphasis in original; internal quotation marks omitted.) *Planning & Zoning Commission* v. *Gaal*, 9 Conn. App. 538, 543–44, 520 A.2d 246, cert. denied, 203 Conn. 803, 522 A.2d 294 (1987); *Ducharme* v. *Putnam*, 161 Conn. 135, 139, 285 A.2d 318 (1971). "Applying this doctrine to challenges of official government action or inaction, the relevant question would not be simply whether the official or agency violated

the law, but rather whether the official or agency violated any duty to the plaintiff." L. Tribe, American Constitutional Law (1978) p. 98. This inquiry, in turn, requires an examination of the function and purpose of the specific constitutional or legal provision involved. *Planning & Zoning Commission* v. *Gaal,* supra, 544.

Under *Gaal,* the city and the board argue that the union lacks standing to challenge the special act under article tenth, § 1, because the union's interests are not even "arguably within the *zone of interests* to be protected or regulated by [that] constitutional guarantee . . . ." (Emphasis in original; internal quotation marks omitted.) *Planning & Zoning Commission* v. *Gaal,* supra, 9 Conn. App. 543–44. It claims, more particularly, that the purpose of article tenth, § 1, is to allocate legislative authority relating to local government affairs, and that that is not a subject in which the union or its members have any special interest.

The union disputes the city's contention for two essential reasons with which this court agrees. First, as the union correctly notes, our Supreme Court has previously adjudicated, without comment or question, a challenge under article tenth by a labor union to state legislation relating to collective bargaining between municipalities and their union employees. *Carofano* v. *Bridgeport,* 196 Conn. 623, 495 A.2d 1011 (1985). Though the *Carofano* court did not decide the issue of standing, its willing assumption of subject matter jurisdiction over the controversy presented there is significant, because, since subject matter jurisdiction cannot be conferred by the silence of the parties; see, e.g., *Gannon* v. *Sanders,* 157 Conn. 1, 6, 244 A.2d 397 (1968); courts must decide the question of subject matter jurisidiction, sua sponte if necessary, whenever there is reason to do so. *State* v. *Lewis,* 176 Conn. 270, 272, 407 A.2d 955 (1978).

Second, the "zone of interests" test is obviously satisfied in the present case precisely because of the subject matter—collective bargaining between the city and its unions—on which the General Assembly presumed to legislate under the constitutional provision at issue here. Had the General Assembly confined its action to enacting special legislation restructuring the city's government or otherwise delimiting its powers and prerogatives without specifically addressing collective bargaining, it might fairly be said that any incidental effects such changes might have had on the union would be too indirect or insignificant to bring the union or its members within the "zone of interests" affected by the text of the constitutional provision. Because, however, the General Assembly relied on article tenth, § 1, as the basis for enacting special legislation touching directly on the union's most vital interests, the General Assembly, by so acting, has necessarily brought the union within that zone. The union, ironically, complains that the powers conferred upon the General Assembly by article tenth, § 1, are not so broad as to permit it to legislate in the area of collective bargaining. If its argument were to be accepted, then the city, of course, would be correct that the union has no special interests which are "protected *or regulated* by the statute or constitutional guarantee in question." (Emphasis added.) *Planning & Zoning Commission* v. *Gaal,* 9 Conn. App. 543–44. Until, however, that is decided, the opposite conclusion must be reached. That is, unless the union meets its burden of proving the special act unconstitutional beyond a reasonable doubt, the legislation must be upheld as a valid legislative effort to "regulate" matters which fall squarely within the union's zone of interests, and it must be concluded that the constitutional provision in question permits such regulation.

The court agrees with the city that the special act was well justified under the "borrowing power" exception to the general prohibition against "special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough," as set forth in article tenth, § 1, of the constitution of Connecticut. First, it is obvious that the immediate purpose of the special legislation was to assist the city through its ongoing fiscal crisis by granting it permission to issue state-guaranteed municipal bonds both to reduce its mounting deficit and to raise badly needed cash to pay for essential services. The special conditions contained in the special act, including those at issue in the present case, were not imposed on the city directly. Instead, they only went into effect once the city determined that it would accept them as the quid pro quo for accepting the state's bond guarantees.

The state had every interest in exacting major concessions from the city in exchange for its bond guarantees. The state's objective in extending the guarantees was not to assume an obligation of unlimited duration. Rather, it was to set the city on a course which would lead to its speedy economic recovery. With that purpose in mind, it would have been counterproductive for the state merely to give the city a quick infusion of cash without ensuring that it had the means or incentives to use it properly. Had that been done, it would at best have been a risky investment of the taxpayers' money, and at worst have been the beginning of a costly and dangerous trend. If the city did not quickly find the political will and economic skill to manage its own finances, it would either die as a political entity, and thereby become a direct burden upon the state's taxpayers, or soon be forced to return to the state for assistance in reducing an even larger deficit. Strict controls were needed, therefore, as part of the bonding

package to prompt the city to seize the initiative and regain control of its own economic destiny.

In addition, the state legitimately feared that if its offer of aid to the city were made either unconditionally or without onerous conditions attached, other financially distressed municipalities might be tempted to turn to the state for help without first attempting to work out their problems on their own. To ensure that such other municipalities would look not to the state's handouts and guarantees but to their own resources to resolve their financial problems before they got out of hand, therefore, it was essential for the state to build strict and unwelcoming conditions into its bond program.

To that end, the special act reasonably tied the extension of bond guarantees to the imposition of strict fiscal controls under the supervision of the board. Mindful that the short-term political interests and/or lack of financial management skills of local political leaders might tempt them to abandon sound fiscal practices by adopting irresponsible budgets, making foolish expenditures and the like, the General Assembly gave the board the power to oversee and veto all major expenditures. The General Assembly thus gave the board the power to accept or reject all budgets and to approve or disapprove all expenditures greater than $50,000. Additionally, and of special interest in the present case, it expressly empowered the board to approve or reject all collective bargaining agreements and to serve as the binding arbitration panel in all arbitrable contract disputes between the city and its unions.

The latter provisions were important for two reasons. Not only were labor costs for municipal employees one of the city's greatest sources of expense, but under existing law and practice, the city's leaders, if corrupt or untutored and left to their own devices, could set

back a municipality's economic recovery substantially by making a miscalculation in labor negotiations. If a case went to binding arbitration before a MERA panel, the panel, on receiving an inadequate presentation by the city as to the true state of its finances, might saddle the city with a long-term obligation it would never be able to meet. Required, as it is, to accept the last best offer of either the union or the town as to each contested issue in dispute, a MERA panel has no option to forge a better arrangement for both parties on its own.

By empowering the board to serve as the binding arbitration panel between the union and the city, and allowing the board to impose its own terms and conditions, if necessary, to reach an appropriate contract, the special act ensured that the city's leaders would make no unwise commitment of resources for which there was no corresponding source of revenue.

When a constitutional provision expressly confers upon the legislature the power to legislate on a given subject, it grants the legislature broad power both to set policy on that subject and to enact legislation thereon, and to pass such other measures, not otherwise unconstitutional, as are necessary and proper to implement those policies and to accomplish the purposes of that legislation. For the union to prevail on its argument, it must, therefore, convince the court, beyond a reasonable doubt, that those portions of the special act here objected to were not necessary or proper to accomplishing the concededly proper, constitutional objective of aiding the city to survive its fiscal crisis by authorizing the issuance of state-guaranteed bonds. Because, for the foregoing reasons, the court is persuaded that the imposition of the aforedescribed controls were necessary and proper measures, reasonably adopted by the General Assembly to further the purposes of the bonding legislation—to ensure the short-

term survival of the city and promote the long-term economic viability of both it and other distressed Connecticut communities—the court concludes that the union has failed to meet its burden of proof, and thus that the special act is constitutional under the borrowing power exception of article tenth, § 1.

The court also finds that the special act is constitutional under the so-called "escape clause" of article tenth, § 1, which provides that the General Assembly retains the power to pass "special legislation relative to the powers, organization, terms of elective offices or form of government of any single town . . . [whenever] in the delegation of legislative authority by general law the general assembly shall have failed to prescribe the powers necessary to effect the purpose of such special legislation." This clause allows the General Assembly to address unanticipated circumstances and to correct inappropriate actions by muncipal governments. See 3 Proceedings of 1965 Connecticut Constitutional Convention pp. 1076–77, remarks of John Alsop. That was precisely the case in the city on April 1, 1992, when the "general law" provided no power that the city could exercise effectively to resolve its financial emergency. Until the state determined that the city could issue municipal bonds to finance its deficit, it could not lawfully do so. Moreover, until the state put its own full faith and credit behind the city's bonds, they would remain unmarketable. Because that authority had not been delegated by general law, No. 92-5 of the 1992 Special Acts was an appropriate enactment under the "escape clause" of article tenth, § 1. The union's home rule challenge is, therefore, denied.

## II

The union next complains that the board was unlawfully established because the General Assembly passed the special act that brought it into existence without

complying with the provisions of General Statutes § 2-14.[3] The union contends, more particularly, that since the special act clearly constitutes special legislation relative to the powers, organization and form of government of a city, the General Assembly could not lawfully enact it without first being asked to do so by either the West Haven city council, by a two-thirds vote of its members, or by at least 10 percent of the town's registered voters, by a petition they have signed. Therefore, it concludes, because the city itself has conceded that no such formal request was ever made, the board must be ruled unlawful and its official acts must be held to be null and void.

The city counters the union's claim with two basic arguments which this court finds persuasive. First, it notes that no legislature can impose its will on all future lawmakers by enacting legislation that cannot be altered. *Patterson* v. *Dempsey*, 152 Conn. 431, 438–39, 207 A.2d 739 (1965). Thus, it is that when one legislature passes legislation which deviates in some respect from directives previously set down by prior legislatures, the current legislature is presumed to have suspended the prohibitory part of any prior legislation which conflicts with it. Id., 439.

In the present case, the enacting of the special act did not leave this matter to be decided by implication.

[3] General Statutes § 2-14 provides in pertinent part: "The general assembly shall enact no special legislation relative to the powers, organization and form of government of any . . . city . . . unless requested by a . . . city . . . in the manner hereinafter prescribed, to enact such special legislation. A resolution requesting the general assembly to enact special legislation and specifying the purpose of such legislation shall be adopted: (1) By a two-thirds vote of the council . . . or body charged with the duty of making annual appropriations in any city . . . . A request for the enactment of special legislation by the general assembly may also be initiated by a petition specifying the purpose of such legislation and signed by not less than ten per cent of the electors of the . . . city . . . as determined by the last-completed registry list and filed with the clerk of such . . . city. . . ."

Instead, the legislators specifically provided as follows in § 16 of the special act: "The provisions of this act shall supersede any provisions of the general statutes, any public or special act and the charter of the city enacted prior to or subsequent to this act other than a subsequent act of the general assembly which specifically states that it supersedes this act." Nothing could be clearer than that the 1992 Connecticut legislature intended to supersede the prohibitory parts of all conflicting sections of the General Statutes, including but not limited to § 2-14.

Notwithstanding the strength of the foregoing arguments, the union suggests that the rights set forth in § 2-14 are "vested rights" which must somehow be read in conjunction with article tenth, § 1, of the constitution of Connecticut, and considered a part thereof. As evidence for this proposition, the union notes that the language of article tenth, § 1, was ratified after § 2-14 first became law, and therefore that the drafters of article tenth, § 1, must be found to have intended that that provision be read in conjunction with § 2-14 to create one uniform body of law.

The argument is unconvincing for two reasons. First, there is nothing in the text of article tenth, § 1, or in its legislative history to suggest that its framers intended to impose the restrictions of § 2-14 on those who might seek to enact legislation thereunder. To the contrary, the history of the "escape clause" makes it plain that one of the drafters' principal purposes was to enable the legislature to overcome the resistance of individual towns and cities to statewide or regional initiatives that, if left to their own devices, they might oppose. Otherwise stated, it was clearly not the intent of the framers of article tenth, § 1, to give individual towns and cities the de facto power to veto otherwise appropriate special legislation by the simple expedient of declining to request it in the manner prescribed by § 2-14.

Secondly, it must be observed that the union's position on this issue is actually undermined, not supported, by the sequence in which § 2-14 and article tenth, § 1, became law. In fact, because the statute was passed *before* the constitutional provision was adopted, the former cannot be regarded as a legislative attempt to implement the latter. To the contrary, the constitutional provision, and in particular its escape clause, must fairly be read to override, if not to repeal, that portion of § 2-14 which purports to limit the General Assembly's power to legislate on matters falling well within its authority under article tenth, § 1.

In conclusion, the union's argument that the acts of the board must be set aside because the special act which created it was passed without complying with § 2-14 is without merit, and must be rejected.

### III

The union next claims that the award issued by the board "is inherently void, illegal and subject to vacatur [under] General Statutes § 52-418 (a) (2) as the members of the Board must, in order to faithfully honor and perform their obligations under the Act to the Board, the City and the State of Connecticut, act with partiality to the City and in fact did so act." Declining to suggest that any particular board member acted with actual bias, the union contends that proof of actual bias is unnecessary to prevail on a partiality challenge to an interest arbitration award. Instead, it claims, what must be shown is "evident partiality," which is established whenever "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration. To put it in the vernacular, 'evident partiality' exists where it reasonably looks as though a given arbitrator would tend to favor one of the parties." *Local 530, AFSCME, Council 15* v. *New Haven,* 9 Conn. App. 260, 274, 518 A.2d 941 (1986) (adopting

the test espoused by the United States Court of Appeals for the Second Circuit in *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds,* 748 F.2d 79 [2d Cir. 1984]).

The union bases its claim that the board acted with "evident partiality" to the city on the presumption that in conducting the present arbitration, board members faithfully fulfilled their primary legal responsibility under the special act, which is to take all measures reasonably necessary to ensure that the city will establish and maintain a balanced budget for five years or until the city's state-guaranteed obligations are satisfied, whichever occurs last. The board, it notes, came into existence upon the issuance of the city's bonds and the extension of state guarantees therefor. It will continue to exist, under the provisions of the special act, until the city achieves balanced operating budgets for two consecutive fiscal years and projects positive operating fund balances for the three succeeding years. Even if such success is realized, the special act provides that the board can be reestablished at any time before the city's state-guaranteed obligations are retired if the city incurs an operating deficit of over one half of one percent of its budget.

To fulfill its statutory mandate, the board was given broad powers to oversee and control the city's financial policies and practices. These, as previously noted, include the power to approve or disapprove city budgets, to review and approve the city's financial plans, to approve or disapprove any expenditure in excess of $50,000, and to approve or reject any proposed collective bargaining agreement and to serve as the binding arbitration panel in all labor disputes between the city and its unions.

The union contends that the special act creates an irreconcilable conflict between the board's statutory

duty to safeguard the city from financial mismanagement and bring its budget into balance and the duty it must assume to both the city and the union if it is to serve as the binding arbitration panel in any labor dispute between them. As the city's financial watchdog, the board must act aggressively to protect the city from wasteful management practices, unwise financial decisions and unnecessary expenditures. To that end, the union insists, the board must use *all* of its statutory powers, including its power to arbitrate municipal labor disputes, to cut the city's costs and achieve optimum return on each dollar the city spends.

As the binding arbitration panel in a statutorily mandated binding arbitration proceeding, by contrast, the board is bound by § 52-418 (a) (2) to reach a full and fair decision on all matters in dispute, resolving each contested issue without partiality to either party or prejudgment of its negotiating position. Here, then, where the city is one party to the dispute and the city's financial interests will be directly and obviously affected by the manner in which the dispute is resolved, the union contends that the board cannot conceivably serve as a neutral arbiter between the city and its unions without abandoning its statutory commitment to protect the city's financial resources. Presuming, in the absence of contrary evidence, that board members faithfully exercised their statutory responsibility to the city throughout the proceedings challenged here, the union concludes that the entire board must necessarily have acted with partiality to the city in issuing its award.

The board and the city reject the union's claim for several reasons. First, the city argues that the union waived its right to object to the board on the ground of partiality when it failed to present that objection before or during the arbitration proceeding. In support of that position, it cites a number of Connecticut cases

which have held, as the city argues, that bias challenges to individual arbitrators must indeed be made before the arbitration panel or be treated as waived. See, e.g., *North Haven Assn. of Educational Support Staff* v. *Board of Education,* 209 Conn. 280, 284, 550 A.2d 1077 (1988).

Because, however, the present challenge is not to an individual arbitrator but to the entire board, before which the union had no choice but to submit its dispute for arbitration, the court concludes that the cases cited by the city are not controlling. Because the board had no statutory authority to declare itself illegal or to surrender its statutory responsibility to serve as the arbitration panel, the union was not required to make the futile gesture of raising its objection before the board to preserve its right of review. Accord *Carofano* v. *Bridgeport,* supra, 196 Conn. 628–29 (holding that party does not waive its constitutional objections to statutorily mandated arbitration proceeding by participating in that proceeding without objection).

The city and the board next claim that even if the union did not waive its right to object to the alleged bias of the board, it has failed to meet its burden of proving such bias under any standard. Initially, it correctly notes that there has been no evidence presented of any actual bias on the part of any of the seven board members. This, of course, includes the mayor of West Haven, whom the special act included on the board along with one appointee of the state treasurer, one appointee of the secretary of the state's office of policy and management, and four gubernatorial appointees, including one from organized labor. Indeed, the union's attorneys argued repeatedly before this court that no such claim was being made. For that reason, they expressly urged this court to ignore, as irrelevant, any evidence on the arbitration record tending to show that

the arbitrators conducted themselves in an impartial manner. The problem with this panel, they contend, was not personal but structural.

In this sense, then, the union relies on the doctrine of *Tumey* v. *Ohio,* 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), where the United States Supreme Court held that a criminal defendant's due process rights were violated when a village mayor, whose salary depended directly on the fines he imposed for state liquor control violations, fined the defendant for such a violation and incarcerated him when he was unable to pay. The *Tumey* court held that the challenged procedure violated the defendant's due process rights in two distinct ways: first, because the mayor as an individual had a "direct [personal] pecuniary interest" in the outcome of the proceeding, and second, because as the village's chief executive, the mayor had an apparent "official motive" to assess fines to increase village revenues. Id.

The defendants reject the comparison between the present case and *Tumey,* and for the following reasons, this court agrees. First, there is nothing in the special act that gives any of the board members any kind of pecuniary interest in the manner in which they perform their duties, either in the conduct of binding arbitration proceedings or otherwise. The board members are not paid. They receive no benefits from their service. And they have no personal interest of any kind in the results of any binding arbitration proceeding over which they must preside. Because the financial interests of the board members are thus totally divorced from their functions as board members, the "direct, personal, pecuniary interest" prong of *Tumey* is clearly not implicated here.

Similarly, though the board has financial oversight responsibility for the city's financial affairs, that fact

does not create an "official motive" for biased adjudication of the sort condemned in *Tumey*. First, as the United States Supreme Court recognized in the later case of *Hortonville Joint School District No. 1* v. *Hortonville Education Assn.*, 426 U.S. 482, 96 S. Ct. 2308, 49 L. Ed. 2d 1 (1976), an employee's constitutionally cognizable property interest in his continued employment requires considerably less procedural protection than the liberty or property interest of a criminal defendant. Cf. *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); *Tumey* v. *Ohio,* supra, 273 U.S. 510.

Second, considerable deference must be given to local administrative boards, whose members are typically dedicated public servants attempting to serve the public interest within the constraints of limited budgets. As a result, the members of such boards are entitled to a "presumption of honesty and integrity [when they serve as] policy makers with decisionmaking power"; *Hortonville Joint School District No. 1* v. *Hortonville Education Assn.,* supra, 426 U.S. 497; which any party claiming otherwise must overcome.

Third, and with specific reference to the procedures here at issue, the union's basic claim—that the board's responsibility to serve as a financial watchdog over the city's finances renders board members incapable of impartially conducting arbitration proceedings between the city and its unions—is simply unfounded. To begin with, the defendants rightly note that under General Statutes § 7-473c, every three person binding arbitration panel appointed under MERA must "give priority to the public interest and the financial capability of the municipal employer, including consideration of other demands on the financial capability of the municipal employer." Hence, though the board may have much more information concerning the financial posture of the city than a typical MERA panel receives about the

municipality before it, its basic mission and that of a MERA panel are the same: to strike a fair balance between the public need for services and the public's ability to pay for those services. The simple fact that the board has "significant governmental and public policy dimensions" in addition to its responsibility to arbitrate municipal labor disputes does not render it incapable of striking that balance in a manner that fairly serves the interests of all. *Hortonville Joint School District No. 1* v. *Hortonville Education Assn.,* supra, 426 U.S. 495.

To the contrary, the board may well have the potential to serve all sides better than a three person MERA panel, which, though it too has one representative each from the union and the municipality before it, has no built-in incentive or power to find the best possible "fit" between the needs and interests of the municipality and those of its municipal employees. The board, with its special mission to ensure the city's long-term financial health, must ever be mindful of the many, varied factors which make the city a desirable place to live. Indeed, the board's task is plainly to preserve the city as such a place, not merely to prolong its existence as a lifeless, albeit self-sufficient, economic shell. The board's job is, therefore, not to interfere with the city's political processes, whereby the city's basic priorities for growth, consolidation, the extension or withdrawal of basic services, and other matters of distinctly local interest will be decided. Rather, it is to ensure that each such local decision to establish priorities and set policy will be accompanied by the sort of careful financial planning that will ensure its success and the city's financial well-being.

In the collective bargaining context, the exercise of this oversight function does not carry with it any commitment to rejecting union demands or city concessions as to the terms and conditions of union members'

employment with the city. What it does do is to ensure that whatever municipal services the city wishes to provide will be necessary to the accomplishment of its stated objectives, and that the package of salaries, benefits, working conditions and other incentives that the city wishes to offer in exchange for the performance of those services will be both sufficient to ensure the reliable delivery of those services and well within the city's ability to pay for them. Oversight of the city's collective bargaining efforts and of all arbitration proceedings between the city and its unions will, therefore, lead to the careful, expert consideration of all proposed terms and conditions of municipal labor contracts to ensure that they are economically sound. By retaining the power to reject those terms and conditions that are marked by the same poor thinking and planning as led the city to the brink of financial disaster in 1992, the board can protect the city from itself and the union from the city's hollow promises of jobs and benefits it cannot provide.

In sum, the court concludes that the union has failed to prove that the board is so structured that its members must act with partiality to the city whenever it serves as a binding arbitration panel between the city and one of its unions. By evenhandedly assuring each party that it will get the benefit of its bargain with the other, the board can do much to keep the city in good financial health without violating its statutory obligation to decide openly and neutrally all contested issues between the parties. Here, as in a MERA arbitration, careful attention to the state of the city's finances is critical to a full and fair resolution of those issues for both sides. That the board here exercises that responsibility with its eyes wide open to the true state of the city's finances only guarantees that its ultimate resolution of all issues will strike a proper balance between

the parties' competing interests regardless of the quality of the city's presentation or the wisdom or savvy of its leaders.

## IV

The union next contends that the special act unfairly discriminates against it and its members by unjustifiably affording them different treatment in dealing with the city with respect to their labor contracts than other unions and their members are afforded under MERA. The concept of equal protection, they argue, "has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." (Internal quotation marks omitted.) *Franklin* v. *Berger,* 211 Conn. 591, 594, 560 A.2d 444 (1989). Although the state has the power to pass legislation which treats different classes of people in different ways, such legislation may not place people into different classes on the basis of criteria unrelated to the objective of the statute. *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 577–78, 512 A.2d 893 (1986).

Connecticut affords the same meaning to the equal protection clause set forth in article first, § 20, of the state constitution as is given to the equal protection clause of the fourteenth amendment to the United States constitution. *Keogh* v. *Bridgeport,* 187 Conn. 53, 66, 444 A.2d 225 (1982). The equal protection clauses of both constitutions are analyzed by means of varying levels of judicial review according to the class of persons seeking protection or the nature of the rights they are asserting. *Daly* v. *DelPonte,* 225 Conn. 499, 512–13, 624 A.2d 876 (1993); *Franklin* v. *Berger,* supra, 211 Conn. 594–95. If the statute in question affects a "fundamental right," one which is explicitly or implicitly guaranteed by our state or federal constitution, the statute must survive "strict scrutiny." *Daly*

v. *DelPonte,* supra, 513; *Zapata* v. *Burns,* 207 Conn. 496, 506, 542 A.2d 700 (1988). A statute can only survive "strict scrutiny" if it is supported by a "compelling state interest." *Laden* v. *Warden,* 169 Conn. 540, 542, 363 A.2d 1063 (1975). If the statute does not affect a fundamental right, or is not asserted by a member of a constitutionally suspect class of persons, then it must survive the so-called "rational basis test." *Daly* v. *DelPonte,* supra, 513. A statute survives the rational basis test if the disparate treatment inherent in the statute bears a rational relationship to a legitimate state goal and is based on reasons related to the accomplishment of that goal. *Franklin* v. *Berger,* supra, 595; *Zapata* v. *Burns,* supra, 496.

The union argues first that the special act affects its fundamental constitutional right to adjudication of its collective bargaining dispute by a neutral panel of arbitrators. Claiming here, as it did on its claim of "evident partiality," that the board was so structured and its responsibilities so defined as to cause the members of the board to act with partiality to the city, the union contends that an adjudication before such a panel violated both the due process clause of the state constitution and, because other unions enjoy the right to proceed before a neutral, tripartite MERA panel, its right to equal protection of the law.

This argument is easily disposed of. First, though it is doubtless correct that adjudication before an impartial tribunal is a fundamental constitutional right, especially where the proceeding before that tribunal is statutorily mandated, there was no due process violation in the present case because, as the court has previously stated, the board is not so constituted and its statutory oversight responsibilities for the city's finances are not so defined as to render it incapable of serving impartially as a binding arbitration panel. See part III of this opinion. There can, therefore, be

no claim of disparate treatment involving the exercise of that right in the present case, for the record here demonstrates that that right was fully honored. In sum, the union's claim that the special act discriminates against it in the exercise of a fundamental right is without merit, and must be rejected.

The union contends next that even if it is not entitled to press its claim under the strict scrutiny standard, it must nonetheless prevail on its equal protection claim on the theory that the special act bears no rational relationship to the accomplishment of a legitimate state purpose. The special act's only purpose, it claims, is illegitimate, and that purpose is to shift the public burden which has resulted from the city's prior financial mismanagement onto the back of union members, who, in the words of the special act's sponsor, will now have "to pick up the tab" for the city's prior financial woes.

The rational basis test, the union argues, requires the court first to determine if there are "natural and substantial" differences between the classes or groups distinguished in the challenged legislation. *Zapata* v. *Burns,* supra, 207 Conn. 509–10. Here, the union argues, the only true distinction between its members and those in other cities' unions is the financial condition of the city at the time of the passage of the special act. This financial distress, it contends, was "substantial" but not "natural," because the city, by its profligacy and mismanagement, created it. The union claims, moreover, that the substitution of the board for the MERA panel and the suspension of MERA's requirement that the arbitration panel choose between the last best offers of the city and the union as to each contested issue in dispute bears no rational relationship to the state's avowed purpose—to assist the city through its economic crisis by allowing it to issue state-guaranteed bonds to raise cash and reduce its deficit. Indeed, if such purpose is to be discerned,

it is the illegitimate purpose of forcing union members to pay off the city's debts with their wages. Since a statute cannot survive the rational basis test when it is based on an impermissible purpose; see, e.g., *Plyler* v. *Doe,* 457 U.S. 202, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); the union claims that the special act challenged here must be held unconstitutional as a denial of its right to equal protection of the laws.

The board and the city object forcefully to the union's characterization of the challenged legislation and its purposes, and accordingly contend that it can easily withstand the union's equal protection challenge. For the following reasons, the court agrees.

It must initially be noted that the burden of proving a statute unconstitutional under the equal protection clause of article first, § 20, falls squarely on the union. Absent a claimed violation of a fundamental constitutional right, that burden cannot be met unless the union can "negative every conceivable [rational] basis which might support [the statute]." (Internal quotation marks omitted.) *State Management Assn. of Connecticut* v. *O'Neill,* 204 Conn. 746, 754, 529 A.2d 1276 (1987).

In the present case, the union has not presented a colorable claim that the special act accorded it disparate treatment in the exercise of a fundamental constitutional right. The special act, therefore, must be held constitutional if there is any rational basis which might support it.

In fact, for reasons previously described, the circumstances surrounding the passage of the special act give overwhelming evidence that the special act serves a "legitimate governmental purpose." The imposition of financial and other controls, including those related to collective bargaining between the city and its unions, were appropriate measures taken by the state to ensure that the city would survive its immediate crisis, adopt

new and better financial management practices, and not encourage other distressed municipalities to follow its lead.

By giving the board the power to approve or reject collective bargaining agreements and to serve as the binding arbitration panel in all labor disputes between the city and its unions, the special act sought temporarily to disempower city leaders from blindly, recklessly or intentionally assuming large financial obligations which the city could not meet with current revenues. What brought the city to this turn of events was a recent history of gross mismanagement. Whatever the root cause of such mismanagement, it was apparent both to the city's new leaders and the legislature that the situation had gotten so far out of control that immediate steps were necessary both to save the city from impending shutdown and promptly to redirect it onto a prudent financial course.

Because the city's recent history was marked by certain spectacularly costly failures to control costs and property revenues, the state reasonably concluded that as part of its package of fiscal controls, the city should be required to submit to independent financial review of its most significant expenditures, at least until it had reestablished a solid track record of sound financial management. And, because labor costs are among the largest, most significant costs for every municipality, oversight of those costs was a key element of the overall package.

Labor costs, moreover, are not always obvious or easy to assess by laypeople charged by law with a handling a city's finances. Especially with multiyear contracts, changing benefits options and pension arrangements, a miscalculation made in one year can compound itself in the future in a way that no single municipality, regardless of its tax base, can easily over-

come. What is more, under MERA, the city is bound by the award of the tripartite arbitration panel which, if the city makes a poor presentation concerning its true ability to afford a given contract arrangement, may burden it for years with the results of its own ineptitude.

To protect the city in the short run against these very problems, the General Assembly conditioned its acceptance of state guarantees for its bonds on the surrender of its independent authority to negotiate freely its own labor contracts or submit, based only on its own presentation as to ability to pay, to the MERA binding interest arbitration process. By substituting the board for the MERA panel and giving the board the right not to select between the city's and the union's last best offers, the special act significantly reduced the likelihood that the city would incur large financial obligations to pay for municipal services that the city could not afford. The purpose of this legislation was legitimate—to restore sound financial management practices to the city while protecting it in the short run from the potentially ruinous consequences of its own ineptitude. And the means adopted to that end were reasonable—ensuring that no large expense for labor would be incurred unless the city was prepared to pay for it.

In conclusion, those provisions of the special act that empowered the board to oversee the city's collective bargaining practices and to serve as the binding arbitration panel in all municipal labor disputes did not violate the equal protection clause of article first, § 20, of the constitution of Connecticut.

V

The union's final claim on this application is that the special act violates article first, § 1, of the 1965 constitution of Connecticut because, by giving the city spe-

cial advantages in its relations with its unions, and doing so for the sole objective of granting personal gain and advantage to the city, the special act grants exclusive public emoluments or privileges to the city without serving or furthering a public purpose. The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." This section of the constitution has concededly been construed to have a "meaning equivalent to the equal protection clause contained in the fourteenth amendment to the United States constitution." *Zapata* v. *Burns,* supra, 207 Conn. 504. To that extent, at least, the union acknowledges that its rights thereunder can be no greater than those already asserted in its equal protection challenge.

The union further claims, however, that challenges under article first, § 1, are afforded different treatment, in that the test is whether the General Assembly's "sole objective" was to grant personal gain or advantage to an individual without serving or furthering a public purpose. See, e.g., *Chotkowski* v. *State,* 213 Conn. 13, 566 A.2d 419 (1989). If it was, and there is no natural and substantial difference between that "man" or "set of men" to whom the legislature has given special advantages and any other "set of men," then the legislation must be declared unconstitutional.

Here, the union charges that the sole purpose of the legislation at issue was to save the city, which acted recklessly or negligently in the management of its own finances, from the consequences of its own misdeeds. Since the only purpose and effect of the legislation is to reward a group of persons who, unlike others with comparable responsibilities, created their own hardship, the law is illegitimate and must be struck down.

The board, however, correctly argues that whenever a piece of legislation "serves *some* public purpose" it is "constitutionally sufficient" under article first, § 1. (Emphasis added.) *Merly* v. *State,* 211 Conn. 199, 213, 558 A.2d 199 (1989). Our Supreme Court in *Wilson* v. *Connecticut Product Development Corp.,* 167 Conn. 111, 115–16, 355 A.2d 72 (1974), explained that in the context of a "public emoluments" claim, a "public purpose" is defined as follows: "The modern trend, both in Connecticut and in other states with similar constitutional provisions, has been to expand and construe broadly the meaning of 'public purpose.' . . . As one court has stated, 'a slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions.' . . . Generally, if an act will promote the welfare of the state, it serves a public purpose. . . . In deciding whether an act serves such a purpose this court has traditionally vested the legislature with wide discretion and suggested that the latter's determination should not be reversed unless 'manifestly and palpably incorrect.' " (Citations omitted.)

Under this standard, there is no question that the special act passes constitutional muster under article first, § 1, of the constitution of Connecticut. First, the special act surely cannot be said to support purely private interests. It served the interests of all the people of the city of West Haven by ensuring that their municipal employees would be paid and continue to render essential services. It served the people of the town of Orange as well by ensuring that the city of West Haven could continue to operate its sewage treatment plant serving them both. It served all persons who work, do business in, or even pass through the city, by ensuring that police services would continue and that their persons and property would remain secure. It served the many

people from neighboring towns and cities who might wish to use West Haven's beaches in the summer of 1992, for those beaches would otherwise have been shut down.

More critically, perhaps, the special act served all of the people of the state by taking tough, affirmative measures both to respond to the city's crisis, yet to deter other municipalities from following the city's lead along the path of close state financial supervision. By shoring up the city's finances in the time of its greatest need, but by doing so in a way that placed ultimate responsibility on the city to pull itself up by its boot-straps to regain the full measure of its fiscal autonomy, the special act created the conditions for the city's full recovery while ensuring against short-term financial disasters while the city was still finding its way back to solvency and stability. By so doing, moreover, the special act gave other towns and cities in financial distress a clear incentive to put their own financial houses in order or to risk surrendering a comparable degree of autonomy to the state in exchange for emergency assistance.

In sum, the state's response to the city's financial emergency was a significant piece of legislation with several important, well conceived public purposes. It is plainly not the sort of legislation which runs afoul of the "public emoluments" clause of article first, § 1, of the constitution of Connecticut.

For all of the foregoing reasons, the union's motion to vacate the arbitration award is hereby denied.